Richard R. Best
Sanjay Wadhwa
Adam S. Grace
Todd D. Brody
Kenneth V. Byrne
Rhonda L. Jung
Attorneys for Plaintiff
**SECURITIES AND EXCHANGE COMMISSION**
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0080 (Brody)
brodyt@sec.gov

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | <u>COMPLAINT</u> |
| Plaintiff, | 21 Civ. 11460 (    ) |
| -against- | |
| THE PREMIER HEALTHCARE SOLUTION, LLC and JOSIAH DAVID, | **JURY TRIAL DEMANDED** |
| Defendants, | |
| PROVISION CORPORATION LLC, and DENIS JOACHIM, | |
| Relief Defendants. | |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against

Defendants The Premier Health Care Solution, LLC ("Premier") and Josiah David ("David")

(collectively, "Defendants") and Relief Defendants Provision Corporation LLC ("Provision") and

Denis Joachim ("Joachim") (collectively, "Relief Defendants") alleges as follows:

## SUMMARY

1.     This matter involves the fraudulent offer and sale of membership interests in Premier ("Premier Membership Interests"), a company controlled by David and whose purported business is to operate a supplemental medical reimbursement plan.

2.     David has an extensive criminal and regulatory history under his former name, Dennis Lee, which he legally changed in 2015.

3.     When soliciting investors to purchase Premier Membership Interests, David and Premier failed to disclose David's criminal and regulatory history.  And when ultimately confronted by investors who discovered his past legal problems, David lied about the reasons for changing his name and told the investors that his criminal and regulatory history was irrelevant.

4.     David and Premier also materially misrepresented Premier's relationships with the banks whose participation in the program was a critical component to Premier's success, telling prospective investors that a bank had agreed to financing terms and suggesting that there was a syndicate of banks who would also participate on those same terms.  In fact, no banks were willing to participate in the program, which made Premier's entire business plan nonviable.

5.     David and Premier also falsely misrepresented that the concept underlying Premier's business model was either patent pending or had already been patented and, as such, Premier would have no competitors to draw away potential customers.  In fact, the United States Patent and Trademark Office ("USPTO") repeatedly denied David's attempts to patent the concept on the grounds that the Premier business process was not patentable for lack of innovation.

6.     David's and Premier's material misrepresentations and misleading omissions induced prospective investors to purchase Premier Membership Interests, and also induced existing investors to purchase additional Premier Membership Interests themselves and to solicit their friends and family members to invest.

7.      From at least July 2017 to the present, Premier has raised approximately $3.9 million from approximately 131 investors.

## VIOLATIONS

8.      By virtue of the foregoing conduct and as alleged further herein, Defendants have violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. 77q(a)], and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b)]], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

9.      Unless Defendants are restrained and enjoined, they will continue to engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

10.      The Commission brings this action pursuant to the authority conferred upon it by Securities Act Sections 20(b) and 20(d) [15 U.S.C. §§ 77t(b) and 77t(d)] and Exchange Act Section 21(d) [15 U.S.C. § 78u(d)].

11.      The Commission seeks a final judgment: (a) permanently enjoining Defendants from violating the federal securities laws and rules this Complaint alleges they have violated; (b) ordering Defendants to disgorge the ill-gotten gains they received with prejudgment interest thereon pursuant to 15 U.S.C. § 78u(d)(5) and Sections 6501(a)(1) and (a)(3) of the National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, to be codified at 15 U.S.C. §§ 78u(d)(3) and 78u(d)(7); (c) ordering Defendants to pay civil money penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; (d) ordering Relief Defendants to pay, with prejudgment interest, all ill-gotten gains by which they were unjustly enriched pursuant to Exchange Act Section 21(d)(5) [15 U.S.C. § 78u(d)(5)]; and (e) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa].

13.     Defendants, directly and indirectly, have made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

14.     Venue lies in this District under Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa].  Defendants are located in the District of New Jersey and certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within this District, including offers and sales in this District.

## DEFENDANTS

15.     **The Premier Health Care Solution, LLC** is a Delaware limited liability company formed on June 8, 2017.  Premier is headquartered in Vernon, New Jersey.  Premier purports to offer a medical insurance reimbursement plan that covers out of pocket insurance costs not covered by health insurance.

16.     **Josiah David**, age 74, resides in Vernon, New Jersey.  David is an adviser to Premier's Board of Directors.  He is also the managing member of Provision Corporation, LLC ("Provision"), one of the relief defendants described below.  In 2015, David legally changed his name from Dennis Lee.

## RELIEF DEFENDANTS

17.     **Provision Corporation, LLC** is a Delaware limited liability company with its headquarters at 200 Park Ave, New York, New York.  Provision is controlled by David, its managing member.  Provision is a managing member of Premier's Board of Directors.

4

18.     **Denis Joachim**, age 54, resides in Covington, Louisiana.  On August 31, 2018, in *United States v. Denis J. Joachim, Donna K. Joachim, and The Total Financial Group, Inc.*, 18 Cr. 00189 (CJB) Joachim was charged by the U.S. Attorney's Office for the Eastern District of Louisiana ("USAO") with, among other things, conspiracy to commit wire fraud and money laundering in connection with a business called The Total Financial Group, Inc. ("Total Financial"), which had a similar business plan as Premier's.  On June 19, 2019, Joachim pleaded guilty to conspiracy to commit money laundering.  Joachim's May 30, 2019 plea agreement expressly prohibits him from being employed by, or from serving as an advisor or consultant to, any employee benefit plan.

### OTHER RELEVANT PERSON

19.     **Allison David**, age 71, resides with her husband David in Vernon, New Jersey.  Alison David manages Premier's business and previously worked for Provision as an assistant to the Board.

### FACTS

## I.     BACKGROUND ON HEALTH EXPENSE REIMBURSEMENT PLANS

20.     Internal Revenue Code Section 105 [26 U.S.C. § 105] is the provision of the United States Tax Code that addresses the tax treatment of amounts received by an insured under accident and health plans.  Section 105 allows certain qualified distributions from accident and health plans to be excluded from income.

21.     Section 105 health reimbursement plans are IRS approved, employer-funded, tax-advantaged, employer health benefit plans that reimburse employees for out-of-pocket medical expenses.

22.     Pursuant to such health reimbursement plans, eligible medical expense reimbursements are excluded from an individual's taxable income.

23.     Moreover, health reimbursement plans save employers money due to a reduction in the payment of FICA taxes, which are payroll taxes, because the amounts paid by the employer for medical expense reimbursements under such plans are not considered wages.

## II.     PREMIER IS BASED ON TOTAL FINANCIAL'S CLASSIC 105 PLAN

24.     From 2013 until 2017, David served as a consultant to Total Financial, the company owned and operated by Joachim and his wife.

25.     Total Financial offered an employee benefits plan that Joachim named the "Classic 105," after Section 105 of the Tax Code.

26.     The Classic 105 purported to provide companies with a supplemental healthcare benefits plan that would reimburse employees for medical expenses.

27.     The basic premise was as follows:  whereas employees using typical healthcare spending plans would lose access to pre-tax deductions set aside for medical expenses, Total Financial offered to lend those amounts back to employees before claims were paid, while still using employees' contributions to handle the claims when they occurred.

28.     Total Financial charged employers monthly fees for this service depending on the number of employees enrolled, and promised that it would obtain bank loans to fund the amounts being lent back to employees.  Total Financial further promised that the employees would not ultimately be responsible to pay back the loans because Total Financial would obtain life insurance policies that would repay the bank loans at the employees' death.

29.     David's responsibilities at Total Financial included trying to find banks to provide the loans to fund the amounts being lent back to employees, a task at which he was unsuccessful.

30.     Over the span of approximately four years, Total Financial signed up approximately 350 employers, with a total of approximately 4,300 employees.

31.     While Total Financial received millions of dollars in fees for the program, Joachim and Total Financial never actually obtained the bank loans or life insurance policies as represented.

32.     The Classic 105 scheme began to unravel in January 2017, after a parallel investigation conducted by the U.S. Department of Labor ("DOL") and the USAO resulted in a search of Total Financial's business offices.

33.     In August 2018, Total Financial, Joachim, and two additional individuals were indicted and charged with fraud based on the failure to obtain the bank loans.  By June 2019, these three defendants had pleaded guilty for their respective roles in the Classic 105 scheme.

## III.    DAVID STARTS PREMIER IN 2017 BASED ON TOTAL FINANCIAL'S PLAN

34.     David formed Premier on or about June 2017 after Total Financial ceased doing business as a result of the parallel investigations into its operations by the DOL and the USAO.

35.     Premier's business model is to deliver to employers a healthcare product similar to the Classic 105 offered by Total Financial.

36.     According to Premier's Partner Investment Informational Brochure ("Investment Brochure"), which David and Premier provided to prospective investors along with various additional written promotional materials describing the Premier plan, "[t]he Premier 105 then, is simply a 105 reimbursement fund deducted from the worker's pay, added to a 125 Cafeteria Group Healthcare Plan, with an optional loan that helps the worker replace the resulting shortfall in his or her take home pay, that winds down each calendar year with the process starting anew each year."

37.     In a purported effort to fund the creation and implementation of Premier's plan, Premier raised money from investors.

38.     In a document provided to prospective investors titled "Investment Teaser," Premier stated that the program "enables participants to fund a large portion of their out-of-pocket healthcare costs and still garner the same take home pay as before the program.  This is a market

disruptor business and is expected to grow larger very quickly because it has a large distribution network ready to go. It is the solution to rising healthcare costs and rising deductibles."

39.     In addition to promoting the Premier program as "the solution to rising healthcare costs and rising deductibles", the Investment Teaser claimed that "only [Premier's] technology can solve" the problems in the health insurance industry, that "the risks were low", and that this was a "very conservative investment."

40.     In August 2017, David began selling the Premier Membership Interests.  The "Introduction to the Partnership Investment Packet" provided to prospective investors explained that:  "We plan for the first offer of 125 units to be sold at $10,000 each. The second tranche will go to $25,000 each for 50 more units and the third tranche will be $50,000 each for the last 50 units we intend to sell.  We will raise five million dollars in total."

41.     On August 9, 2017, Premier filed a Form D indicating reliance on Rule 504(b) for a $1 million equity offering.[1]  On May 24, 2018, Premier filed an amended Form D, increasing the offering amount to $5 million.  The following day, Premier again amended the Form D indicating the offering was expected to last more than one year.

42.     While Premier recruited sales agents to pitch the program to prospective investors, David instructed the agents to direct all leads to David, who speaks directly to prospective investors about the Premier plan and Premier Membership Interests.

43.     David also encouraged existing investors to purchase additional Premier Membership Interests themselves and to solicit their friends and family members to invest.

---

[1]     Form D is used to file a notice of an exempt offering of securities with the Commission. The federal securities laws require the notice to be filed by companies that have sold securities without registration under the Securities Act in an offering made under Rule 504 or 506 of Regulation D or Section 4(a)(5) of the Securities Act.

44.     According to the Investment Brochure, the Premier plan, like Total Financial's Classic 105, consists of a tax-exempt contribution from the employee to Premier, a loan from a lender to repay the employee's contribution, and an insurance policy obtained by Premier payable at the employee's death to repay the loan.

45.     As described in the Investment Brochure:  "This business holds significant intellectual property.  Here is the concept in brief summary, the rising costs of premiums for healthcare for employers caused them to raise the deductibles for the plan for their employees in order to try to stay in budget.  Now the employees have very high deductible plans.  That means the employees are paying the first $5,000 or more before the insurance coverage even kicks in.  They used to pay less than $1,000 out-of-pocket for medical expenses.  How do you solve the problem for both the employer and the employees?  We have the answer.  We provide money to the employees to cover their shortfall in take home pay after they make contributions from their pay every payday to fund a pre-tax reimbursement account to cover their out-of-pocket costs.  The private loan from us to the employees is collateralized by a death benefit and it is paid back by the insurer when they die.  The employee is never required to make any payments on the loan we provide during their lifetime.  This is all done in a very clever manner that is in compliance with the rules for reimbursement plans and all the appropriate IRS Codes.  The employer can then raise deductibles to avoid price increases without negatively affecting the finances of their workers (in fact, our program very positively affects them).  We devised a funding mechanism through community banks for this purpose that is very innovative."

46.     While the Investment Brochure disclosed Joachim's indictment in the Investment Brochure and explained that this was why the Classic 105 program failed, the Investment Brochure claimed that, unlike Total Financial, Premier would fulfill its promises to employers.

47.     The Premier Operating Agreement ("Operating Agreement"), effective as of June 8, 2017, provides that the LLC will initially be managed by Provision (through its own board) and David, who is described as "an adviser".

48.     While the Operating Agreement provides for eventual member selection of a permanent Board of Directors (and the potential for at least some LLC members to become board members), the triggering event has not yet occurred, and Provision and David have remained in control of Premier since the company's inception.

49.     Provision pays David approximately $525 per week for his advisory role.

50.     The offering of Premier Membership Interests has not ceased since the company's inception.

51.     To date, Premier has raised approximately $3.9 million by selling Premier Membership Interests to approximately 131 investors throughout the United States.

52.     Each investor was promised a share of Premier's profits based on the number of units purchased.  The Investment Teaser states that "The ROI return on investment for this proven business model is outstanding: the earlier you get in, the higher the return e.g. 37% ROI in year one, but they go even higher than that for subsequent years as profits increase."

53.     To date, Premier has not launched its program.

54.     Over the last two years, Premier has given investors a series of reasons for why the program has not launched.  For example:

    a.     In an April 4, 2019 investor call, Allison David stated, "This project is ready with everything but a Premier opinion letter and operating capital to get everything to get the last part of the way to the finish line.  With the opinion, we can easily fund this project."

b.  During a September 6, 2019 investor call, David told investors, "[t]he reason we are not on the market is so that we are doing everything we need to do to assure our investors and associates that has been accomplished unlike [Total Financial] before we go to market."

c.  In a January 20, 2021 investor call, David disclosed that they recently realized that they needed to modify the structure of the business for legal reasons.

d.  During this same call, Allison David stated, "[o]ur top law firm required for us to change our program into an insurance product that is not stand alone and needs to be integrated with a companies' [*sic*] major medical group healthcare plan.  The key word there is integrated."  Allison David went on to say, "[o]therwise, according to them, it wouldn't be ACA compliant.  Somehow we failed to realize what that fact meant."

## IV.   DAVID AND PREMIER'S FRAUDULENT REPRESENTATIONS AND OMISSIONS TO PROSPECTIVE INVESTORS

### A.   OMMISIONS AND MISLEADING STATEMENTS RELATING TO DAVID'S EXTENSIVE CRIMINAL AND REGULATORY HISTORY

55.   Beyond his role as initial member and "adviser" to Premier, David is the face of Premier.  He speaks to all prospective investors before they invest.  He leads all investor calls with existing investors.  And yet, despite the central nature of his role in the business, David and Premier hid from investors David's extensive criminal and regulatory history.

56.   Premier's Operating Agreement provides:

Member Management. The business and affairs of the Company shall be managed by the Members and the Members shall act in accordance with the voting requirements set forth in Article 2 above. The membership management shall proceed as follows:

(a)      Provision Corporation, LLC (represented by its Board of Directors) and Josiah David as initial owners of 500 units, the ONLY initial members and owners of units of ownership in The Premier Healthcare Solution, LLC, shall direct the affairs of the Company during the first and second phase of the setup, as the Temporary Board of Directors and their adviser,

respectively. The Temporary Board shall make all the decisions and direct the affairs of the partnership until such time as a Premier Healthcare Solution, LLC Board of Directors is selected. Once the first 700 member units are issued, the members of The Premier Healthcare Solution, LLC, shall be given the opportunity to nominate Members for a five person Premier Board of Directors, and vote to approve the directors.

57.     The Investment Teaser states: "[t]hey [Premier] have a solid management team in place with strong industry experience, as well as meaningful ownership stakes and generous incentives to highly motivate them to achieve goals.  This firm retains several expert consultants to complement the team and has a high quality staff."

58.     During an April 16, 2018 call with David to discuss the Premier program, a prospective investor asked David "What is your background?"  David replied:  "[w]ell, actually the fact of the matter is I am an inventor and I have never worked for anybody my whole entire life except me and I have fun.  I do whatever the hell I want to do and I like to invent things."  David went on to tell the investor he agreed to join Premier as a favor to the board President.

59.     While touting the experience of its management team and high quality staff, neither David nor Premier disclosed David's extensive criminal and regulatory history.

60.     In 2015, David legally changed his name to Josiah David.  Prior to that time, he was known as Dennis Lee.

61.     As Dennis Lee, David had an extensive regulatory history and two guilty pleas in criminal proceedings arising from decades of making a living as a pseudoscientist traveling around the country marketing fake technologies such as:  (1) a perpetual motion machine that would provide free electricity from nothing; (2) technology that allowed cars to run on water; and (3) a fuel efficiency device that made every car a hybrid.

62.     By 2005, David had been sanctioned in numerous states for various unlawful, unfair or deceptive business or trade practices or for the unlawful sale of securities, including: (1) In 1985, David was permanently enjoined from selling products relating to energy savings in Washington; (2)

In 2001, David was permanently enjoined from selling dealer ownership units, discount buying club units or any products in Maine; (3) In 2001, David was again enjoined in the State of Washington from promoting, marketing, selling, opportunity to invest in free electricity technology; (4) In 2001, David was enjoined from soliciting investment into a "discount buyers club" for his electricity technologies in the State of Alaska; and (5) In 2001, David was permanently prohibited and enjoined from promoting and offering any opportunity to invest or contribute to a program or plan in the state of Oregon

63.     In 1990, David pleaded guilty in California for fraud/failure to disclose information in a marketing plan and was sentenced to prison for two years.  (*The People of the State of Cal. v. Dennis M. Lee*, No. CR-24072 (Cal Sup. Ct., Ventura Cty.)).

64.     In 2004, David pleaded guilty in Kentucky for failing to register a business opportunity.  (*Commonwealth of Kentucky vs. Dennis M. Lee*, No. 02-CR-0995 (Jefferson Cir. Ct.)).

65.     In 2011, David settled a federal case brought by the FTC based on alleged deceptive practices related to his fuel efficiency device that claimed to turn any car into a hybrid.  (Case No. 2:09-141 (D.N.J.))  The December 7, 2011 consent order in that case included a permanent injunction against "[m]aking any false or misleading representation of material fact directly or by implication, including but not limited to any material misrepresentation concerning the performance, efficacy, nature, characteristics, benefits, or safety of any product or service …."  (Docket # 165).[2]

66.     Tellingly, in an August 2011 report required in connection with the FTC action, David (then still Dennis Lee) described that he had problems recruiting sales people for the

---

[2]     David, his criminal history (when he was named Dennis Lee), and his tactics are discussed in detail on the internet, in magazine articles, and in the book, *The Skeptics Guide to the Universe: How to Know What's Really Real in a World Full of Increasingly Fake. See, e.g.*, Michael Maiello, *Power Failure*, Forbes: Investment Guide (June 6, 2005); Press Release, FTC, *FTC Sues Promoters of Bogus Fuel Efficiency Device* (Feb. 2, 2009) https://www.ftc.gov/news-events/press-releases/2009/02/ftc-sues-promoters-bogus-fuel-efficiency-device.

company he was then associated with because while the recruits were impressed with the company, "when they researched Lee's name many of them disengaged."  As such, David described that he needed to use a "nom-deplume" [sic].

67.    In March 2020, a Premier investor who had learned of David's past revealed David's criminal history to the other Premier investors.

68.    In response, David published a series of podcasts at www.amazingtruehistory.com and also discussed his past during an investor conference call.

69.    In a June 2020 newsletter distributed to existing Premier investors, David stated: "Somebody thinks he made the discovery of the century and has done an exhaustive search on me (David) and my background.  This is a disgruntled EX-Team Leader that happens to be the only agent or Team Leader we have ever fired.  It is really not relevant to Premier but he has discovered that I have two names.  I was not always Josiah David.  That is true.  Not real relevant to our project at hand, but true.  He also wanted to expose my supposed history but what he selected to share leaves some of the most important facts out.  Once again if anything, listening to my actual facts in the matter may explain a lot about why I never give up until we overcome whatever obstacle we encounter, but it is not real relevant to the project at hand."

70.    In the June 2020 newsletter, David explained why he changed his name stating that: "I was Dennis Lee back then and have, as an inventor, been involved in some amazing technologies, and had a major battle with the fossil fuels companies.  I held my own, but the Board asked me if I would disconnect from that history back when we started this project, and asked me to change my name, which I had been intending to do anyway."

71.    David's explanation in the June 2020 newsletter was also false and misleading as David changed his name in 2015, well prior to Premier being founded.  Moreover, David controlled

the Premier Board.  Consequently, his story that the Board asked him to "disconnect" from his prior

history was simply a misleading way of saying that he decided to do so.

### B.   FALSE STATEMENTS REGARDING PREMIER'S BANKING RELATIONSHIPS

72.     Central to Premier's ability to execute on its business plan was the ability to secure

financing from banks willing to participate in the program.

73.     Premier's Investment Brochure lists "Having many excellent banks as partners"

among the "Critical Success Factors."

74.     As a consultant to Total Financial, David had been involved in Total Financial's

unsuccessful attempts to secure bank loans for that program.  David knew or should have known

from those failures that there was a significant risk that Premier would never be able to secure bank

financing.

75.     Not only did Premier fail to disclose to investors any concerns that Premier might

not succeed in lining up banks, it affirmatively lied to prospective investors that it had already

cemented a relationship with a bank, when it had not done so.

76.     In a section of the Investment Brochure titled "Banking Partners," Premier

represented:

> one of the syndicated banks, a MN-based bank, Minnwest, has independently
> performed its diligence in order to gain a sense of the magnitude of the loss or
> default exposure, the historical utilization of the 105 plan, and the type and size of
> the employer customers targeted for the Premier 105.  This MN-based bank wants to
> participate in the plan funding which has them enter into one-year revolving $150
> million loan subject to a third party accepting an amount equal to 8% of the possible
> shortfall risk (i.e. exposure of $12 million).
>
> In exchange, the MN-banker offered to pass through a portion of the interest spread
> to the insurer who accepts this risk at a fee of 1% per annum of the total loan
> amount.  The bank agreed to a 4% loan rate and will accept a 3% loan rate to secure
> the certainty of eliminating the loss exposure.

Premier has had discussions with many banks who have already accepted the economic terms of the MN-bank, i.e. haircut on loan interest for the reduced credit risk.

77.     These statements were all false.

78.     In late 2014 – while David was still associated with Total Financial and more than two years prior to the founding of Premier – David approached Minnwest with a proposal for the bank's consideration.

79.     Contrary to Premier's representations that the bank performed due diligence, "wants to participate" in a "$150 million loan," and "agreed" to specific rate terms, Minnwest declined the proposal early in the process.  The bank never conducted due diligence.  And the bank never agreed to enter into a one-year revolving $150 million loan.  In fact, that amount would have far exceeded the bank's legal lending limit of $20 million.

80.     And far from Premier's suggestion to investors that there was a syndicate of banks ready to participate, Minnwest understood that there were no other bank lenders.  That fact was important to Minnwest who did not want to be the first bank to participate in this novel program.

81.     After quickly rejecting David's proposal in 2014, Minnwest had no further contact with David.

82.     David knew all of these facts from his communications with the bank.

83.     In a call with Premier investors in January 2021, David finally disclosed that, as of January, Premier had no banks committed to the program.

## C.     FALSE STATEMENTS REGARDING PREMIER'S INTELLECTUAL PROPERTY

84.     Premier's Investment Brochure states numerous times that the concept underlying Premier's business model is either patent pending or has already been patented.

85.     For example, the Investment Brochure stated that "[t]his business holds significant intellectual property" and that "[s]ome of the process concepts described herein are patent pending

or otherwise legally protected."  This language was all highlighted, which the Investment Brochure explained was for sections of the document which Premier believed were of "particular interest".

86.     The Investment Brochure further stated that Premier's business model was "a patented process".

87.     In an October 19, 2019 call with investors, David stated three times that the program was patent protected.

88.     David told the investors on the call that: "[a]nd by the way, the process I am about to tell you we put patent protection on that process because actually this has never been done before in banking history what we developed."

89.     David also stated, "we have patent protection on that process."

90.     David further stated, "[o]ur program is basically a service business that goes out and helps people make money helping people do our plan.  So our whole program now, his [Joachim's] program and ours is all patent protected with a patent in process on this whole program including every innovation I'm going to tell you about on this call and that we had also applied for patent protection on."

91.     Defendants also repeatedly explained the importance of this patent protection to prospective investors.

92.     The Investment Brochure states that "Their strategic competitive advantage is their innovative program design which is patent protected.  This creates a barrier or wall making it very difficult for any competitor to penetrate their market.  This leaves the playing field wide open for us to succeed in and go far beyond our goals."

93.     In a separate document provided to prospective investors entitled "Why are we raising Five million dollars to set up Premier Partners", Defendants further explained the importance of the patent protection, stating:  "we developed the funding mechanism (that we have

17

protected) that can take this to companies with that many workers already in one company. ALL companies (large and small) need what only we can give them." The document further represented that "Our protected bank funding program is hard to beat and it can be used with every community bank across the country to help local employers and their employees in their community (the very definition of community banking). So, we have an almost unlimited source of unbeatable funding available for our program."

94.     David personally explained the importance of the patent protections in the November 20, 2019 call with existing investors, stating: "The fact of the matter is we're getting in position to take the market. We can do that. We don't have any competition; don't think that we can get any especially with our patent protection in place. . . . We've got something no one else can have without infringing on our patent."

95.     These were all false or misleading statements.

96.     On October 29, 2014, David and Joachim did indeed file a patent application (individually, as opposed to on filing behalf of Total Financial or any other entity) covering the process used by Total Financial for the Classic 105 program. However, the patent application was rejected by the USPTO on July 22, 2018.

97.     David submitted additional materials to supplement the application but the supplemental application was denied on March 18, 2019 because the business process that was the subject of their application was not patentable for lack of innovation.

98.     On November 4. 2019, David appealed the denial of the patent application. On December 28, 2020, the USPTO rejected the appeal.

## V.    PAYMENTS TO RELIEF DEFENDANTS JOACHIM AND PROVISION

99.    In July 2017, Premier entered into a consulting agreement with Joachim, guaranteeing him payments of $12,000 per month or (if greater) 10% of net amounts from fees paid by participating employees.

100.    Premier subsequently increased the monthly payment to $14,000.  In December 2018, Premier increased the monthly payment to $20,000.

101.    In December 2019, Premier sent Joachim a new agreement that reduced the weekly amount to $2,000.  The new agreement "abolish[ed]" the original agreement and provided that no future consulting services would be required.

102.    The new agreement acknowledged that Joachim had notified Premier that he was no longer able to work as a consultant.

103.    The new agreement also acknowledged the lack of utility of Joachim's Classic 105 program to Premier's own program, stating:  "But more importantly, because Premier was unable to obtain a positive legal opinion of Mr. Joachim's original program (of its overall feasibility and/or of its compliance with ERISA, IRS, or any other from on an account based HealthCare reimbursement plan) … Premier was compelled, with the assistance of its lawyers to design and completely restructure another 105 Program in a totally different classification before it could be launched to employers across the Nation."

104.    The new agreement, however, accepted that Joachim's original design had certain elements with value to Premier", that a strong bond had developed between the parties during the course of their business relationship, and that Joachim had serious health and legal issues – referring to such issues as a "period of infirmity and legal crisis" – and that it would be a "hardship" to cut off Joachim's entire source of income.

105.    In total, Premier has paid Joachim approximately $518,000.

106.    David and Premier used this consulting agreement – pursuant to which Joachim delivered no actual consulting services – to provide disguised benefits to a former business partner who, under the terms of his plea agreement, was prohibited from receiving such payments.

107.    Premier also transferred approximately $224,000 to Provision.

108.    Given Provision's control by David and its role in managing Premier's affairs, Provision does not have a legitimate interest in any investor monies it has received.

## VI.    THE PREMIER MEMBERSHIP INTERESTS ARE SECURITIES

109.    The Premier Membership Interests offered and sold by Premier and David were offered and sold to potential investors as an investment of money in a common enterprise with an expectation of profits to be generated from the efforts of the issuers and, as such, were "investment contracts" and, therefore, "securities" within the meaning of Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)].

110.    In the Form D filed with the Commission on August 9, 2017 (described above in Paragraph 41), Premier identified the Membership Interests as "Equity."

111.    Page 4 of the Premier Operating Agreement states "[t]he ownership of the Company shall be represented by 1,000 membership units ("Membership Units").  The Company is authorized to initially issue 1,000 Membership Units, and shall issue 490 Membership Units to Provision Corporation, LLC and 10 Membership units to Josiah David, the Initial Member(s) as set forth on Exhibit A.  Once the Company and the Initial Member(s) have signed this Agreement, additional members shall be admitted according to Exhibit A.  The Company may but shall not be required to issue Membership Certificates."

112.    David pooled the investors' funds in a common bank account and investors were led to believe that they would receive a return in proportion to the principal that they invested.

113.     Reasonable investors would have expected the business to be profitable based on David's projection that the return on investments would exceed 37% in year one alone.

114.     These profits were to be generated solely through the efforts of Premier and its management.  At no time did investors play any role or have any control over the operation of the business.

**FIRST CLAIM FOR RELIEF**
**Violations of Securities Act Section 17(a)**
**(David and Premier)**

115.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 114.

116.     Defendants, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (1) knowingly or recklessly have employed one or more devices, schemes or artifices to defraud, (2) knowingly, recklessly, or negligently have obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (3) knowingly, recklessly, or negligently have engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

117.     By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder
### (David and Premier)

118.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 114.

119.     Defendants, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly have (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

120.     By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## THIRD CLAIM FOR RELIEF
### Unjust Enrichment
### (Joachim and Provision)

121.     The Commission re-alleges and incorporates by reference here the allegations in Paragraphs 1 through 114.

122.     Joachim received approximately $518,000 in improper distributions of investor funds.

123.     Joachim has no legitimate claim to these funds.

124.     Joachim obtained the funds under circumstances in which it is not just, equitable, or conscionable for it to retain the funds.

125.     Joachim has therefore been unjustly enriched.

126.     Provision received approximately $224,000 in improper distributions of investor funds.

127.     Provision has no legitimate claim to these ill-gotten gains.

128.     Provision obtained the funds under circumstances in which it is not just, equitable, or conscionable for it to retain the funds.

129.     Provision has therefore been unjustly enriched.

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

**I.**

Permanently enjoining Premier and David, and their agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Securities Act Section 17(a) [15 U.S.C. § 77q(a)] and Exchange Act Section 10(b) [15 U.S.C. §§ 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. §§ 240.10b-5].

**II.**

Ordering Premier and David to disgorge the ill-gotten gains they received directly or indirectly with prejudgment interest thereon as a result of the alleged violations, pursuant to 15 U.S.C. § 78u(d)(5) and Sections 6501(a)(1) and (a)(3) of the National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, to be codified at 15 U.S.C. §§ 78u(d)(3) and 78u(d)(7);

**III.**

Ordering Premier and David to pay civil monetary penalties under Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)];

23

**IV.**

Ordering Joachim to pay, with prejudgment interest all ill-gotten gains by which he was

unjustly enriched, under Exchange Act Section 21(d)(5) [15 U.S.C. § 78u(d)(5)];

**V.**

Ordering Provision to pay, with prejudgment interest all ill-gotten gains by which it was

unjustly enriched, under Exchange Act Section 21(d)(5) [15 U.S.C. § 78u(d)(5)]; and

**VI.**

Granting any other and further relief this Court may deem just and proper.

## JURY DEMAND

Pursuant to Rule 39 of the Federal Rules of Civil Procedure, Plaintiff demands that this case

be tried to a jury.

Dated:  New York, New York
        May 19, 2021

                            _____/s/ Richard R. Best_____

                            **RICHARD R. BEST**
                            **REGIONAL DIRECTOR**
                            **Sanjay Wadhwa**
                            **Adam S. Grace**
                            **Todd D. Brody**
                            **Kenneth V. Byrne**
                            **Rhonda L. Jung**
                            Attorneys for Plaintiff
                            SECURITIES AND EXCHANGE COMMISSION
                            New York Regional Office
                            Brookfield Place
                            200 Vesey Street, Suite 400
                            New York, New York 10281-1022
                            (212) 336-0080 (Brody)
                            brodyt@sec.gov

## LOCAL RULE 11.2 CERTIFICATION

Pursuant to Local Rule 11.2, I certify that the matter in controversy alleged in the foregoing

Complaint is not the subject of any other action pending in any court, or of any pending arbitration

or administrative proceeding.

/s/ *Richard R. Best*

Richard R. Best
Regional Director
Counsel for Plaintiff
U.S. Securities and Exchange Commission
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0042

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | |
| Plaintiff, | 21 Civ. 11460 (    ) |
| -against- | |
| **THE PREMIER HEALTHCARE SOLUTION, LLC and JOSIAH DAVID,** | |
| Defendants, | |
| **PROVISION CORPORATION LLC, and DENIS JOACHIM,** | |
| Relief Defendants. | |

## DESIGNATION OF AGENT FOR SERVICE

Pursuant to Local Civil Rule 101.1(f), because the Securities and Exchange Commission (the "Commission") does not have an office in this district, the United States Attorney for the District of New Jersey is hereby designated as eligible as an alternative to the Commission to receive service of all notices or papers in the above-captioned action.  Therefore, service upon the United States or its authorized designee, David Dauenheimer, Deputy Chief, Civil Division United States Attorney's Office for the District of New Jersey, 970 Broad Street, Suite 700, Newark, NJ 07102, shall constitute service upon the Commission for purposes of this action.

/s/ *Richard R. Best*

Richard R. Best
Regional Director
Counsel for Plaintiff
U.S. Securities and Exchange Commission
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0042