<u>**NOT FOR PUBLICATION**</u>

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | No. 21cv11460 (EP) (SDA) |
| v. | **OPINION** |
| THE PREMIER HEALTHCARE SOLUTION, LLC, *et al.*, | |
| Defendants. | |

**PADIN, District Judge.**

Plaintiff Securities and Exchange Commission (the "SEC") brings this civil enforcement action against Defendants The Premier Healthcare Solution, LLC ("Premier") and Josiah David ("David") (collectively, "Defendants"), as well as Relief Defendants Provision Corporation LLC ("Provision") and Denis Joachim ("Joachim") (collectively, "Relief Defendants"). The SEC alleges that Defendants committed securities fraud in violation of Section 10(b) of the Securities Exchange Act of 1934 ("Section 10(b)") and Rule 10b-5 thereunder ("Rule 10b-5") and Section 17(a) of the Securities Act of 1933 ("Section 17(a)") by making false and misleading statements to prospective purchasers of "ownership units" in Premier regarding the company's (1) management, (2) banking relationships, (3) intellectual property, and (4) legal opinion letters regarding its business. D.E. 1 ("Complaint" or "Compl.").

The SEC moves for summary judgment on the issue of liability only for each of its claims against Defendants Premier and David. D.E. 109 ("Motion" or "Mot.").[1] Defendants oppose the

---

[1] For ease of reference, the Court refers to the SEC's brief in support of its Motion. As explained in Section I.D, *infra*, the notice of Motion is at D.E. 108.

Motion. D.E. 122-1 ("Opposition" or "Opp.").[2]  The SEC replies. D.E. 120 ("Reply").  The Court

decides the Motion without oral argument.  *See* Fed. R. Civ. P. 78; L. Civ. R. 78.1(b).  For the

following reasons, the Court will **GRANT** the Motion.

## I.    BACKGROUND[3]

_____

[2] As also explained in Section I.D, *infra*, Defendants re-filed their brief in opposition to the Motion to comply with this District's Local Rules.  The Court refers to this corrected brief in opposition throughout.

[3] The materials that Defendants, represented by counsel, have submitted in opposition to the Motion, including their brief, are shockingly deficient.

Federal Rule of Civil Procedure 56.1(c)(1)(A) provides that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ."  Local Civil Rule 56.1(a) supplements the federal rules, requiring that the party opposing summary judgment "furnish . . . a responsive statement of material facts, addressing each paragraph of the movant's statement, indicating agreement or disagreement and, if not agreed, stating each material fact in dispute and citing to the affidavits and other documents submitted in connection with the motion" and cautions that "any material fact not disputed shall be deemed undisputed for purposes of the summary judgment motion."

Here, Defendants have submitted a Response to the SEC's Statement of Undisputed Material Facts, D.E. 115 ("Defs. RSUF" or "RSUF"), in which they claim they "provide[] two hundred (200) disputes to [what] the SECURITIES AND EXCHANGE COMMISSION alleged were undisputed facts, and in addition, provide[] thirty-four (34) addendums to partially agreed facts," Opp. at 4.  Defendants' RSUF is, however, completely devoid of the record citations required by Local Civil Rule 56.1—consisting instead almost exclusively of bald and conclusory assertions "disputing" a statement.  *See* Defs. RSUF ¶ Defendants' Opposition brief is similarly devoid of record citations (or even citations to their deficient RSUF) that could assist this Court in identifying disputed facts—except for one citation each to each of the three exhibits Defendants submitted, D.E. 122-2 ("Defs. Exs.").  *See* Opp.  The Court will not consider Defendants' Exs. 1 or 2, letters from certain investors in Premier, because they were not sworn under penalty of perjury.  *See Woloszyn v. Cnty. of Lawrence*, 396 F.3d 314, 323 (3d Cir. 2005) (affirming grant of summary judgment and district court's decision not to consider unsworn statement).  The Court will, however, consider Defendants' Ex. 3, as well as Defendant's sworn declarations: Declaration of Counsel to Defendants Anthony Montemurro, D.E. 116 ("Montemurro Decl."); Declaration of Board President of Premier Michael J. Kafes, D.E. 117 ("Kafes Decl."); Declaration of David, D.E. 118 ("First David Decl."); Declaration of David Relating to Informationals, D.E. 119 ("Second David Decl.") (collectively, "Defs. Decls.").

While (1) as the SEC argues, *see* Reply at 2-3, Local Civil Rule 56.1 provides that any material fact not disputed in a responsive statement of material facts shall be deemed undisputed and (2) "[i]t is not the Court's responsibility to comb the record on behalf of [Defendants'] counsel," *Baker v. The Hartford Life Ins. Co.*, No. 08-6382, 2010 WL 2179150, at *2 n.1 (D.N.J. May 28, 2010), *aff'd sub nom. Baker v. Hartford Life Ins. Co.*, 440 F. App'x 66 (3d Cir. 2011),

### A.    The Formation of Premier

In 2017, David and Provision formed Premier as a Delaware limited liability company, becoming the two initial members of the company.  SEC SUF ¶ 194.  They established Premier to offer a "healthcare insurance add-on program" to employer-sponsored health insurance plans that would cover the "lion's share of [employees'] out-of-pocket [healthcare] costs" (the "Premier Plan").  *Id.* ¶ 358.

Provision is itself a Delaware limited liability company formed in 2013 by American Business Consultant Group Holding, LLC ("ABC Group").  *Id.* ¶ 150; Ex. 73 to Declaration of SEC Senior Trial Counsel Todd D. Brody, D.E.s 111-13 ("First Brody Decl.").  ABC Group, in

---

the Third Circuit has cautioned that "the purpose of certain district local rules pertaining to motions is the facilitation of the court's disposition of motions, not punishment." *Boswell v. Eoon*, 452 F. App'x 107, 111-12 (3d Cir. 2011) (citing with approval case from this District excusing failure to strictly comply with Local Civil Rule 56.1).

Following this guidance—and given that the competent evidence Defendants have submitted is limited in volume, "the Court will presume that the facts [in the SEC's Statement of Undisputed Material Facts, D.E. 110 ("SEC SUF" or "SUF")] are true unless they are controverted by the evidence in the record."  *Digiacomo v. Prudential Ins. Co. of Am.*, 501 F. Supp. 2d 626, 629 (D.N.J. 2007) (cited approvingly by the Third Circuit in *Boswell*, 452 F. App'x at 112); *see also Fantastic Sams Franchise Corp. v. Weekes*, No. 06-4558, 2023 WL 2696595, at *1 (D.N.J. Mar. 29, 2023) (presuming movant's facts undisputed "unless demonstrated by the parties' record evidentiary submissions" where non-movant's statements in responsive statement of facts were nonresponsive).

Accordingly, the Court will deem admitted the facts in the SEC SUF that Defendants assert—without citation—in their unsworn RSUF are "disputed" unless the record evidence supports finding such a dispute.  For the avoidance of doubt, while the Court will consider Defendants' Declarations as part of the record, the Court will nevertheless deem admitted the facts in the SEC SUF against which Defendants offer only the conclusory allegations and speculation that are rampant in the Declarations and will only consider *specific facts* set forth therein as potentially sufficient to dispute an SEC fact.  *See Blair v. Scott Specialty Gases*, 283 F.3d 595, 608 (3d Cir. 2002) ("In order to satisfy the standard for summary judgment 'the affiant must ordinarily set forth facts, rather than opinions or conclusions.  An affidavit that is "essentially conclusory" and lacking in specific facts is inadequate to satisfy the movant [or non-movant]'s burden.'") (alterations in original) (quoting *Maldonado v. Ramirez*, 757 F.2d 48, 51 (3d Cir. 1985)).  Unless indicated otherwise, the facts set forth in this section (and throughout this Opinion) have either (1) been deemed admitted pursuant to the process outlined above or (2) were explicitly admitted by Defendants in their RSUF.

3

turn, is also a Delaware limited liability company founded by David in 2010, and was operated day-to-day by David and his wife Alison David until Provision's formation. SEC SUF ¶¶ 136-37, 146, 151. ABC Group formed Provision to connect businesses to providers of services helpful to those businesses, in exchange for a stake in the business and/or the service provider. *See id.* ¶¶ 153-54.

Soon after its formation, Provision began working on behalf of The Total Financial Group ("Total Financial") and its owner, Joachim. *Id.* ¶¶ 170, 172. Total Financial, like (eventually) Premier, purported to offer a healthcare reimbursement add-on program (the "Total Financial Plan"). *Id.* ¶¶ 171, 358. As of 2014, Provision's focus was seeking out employers for Total Financial to sign up for its Plan, as well as signing up banks to provide loans to Total Financial to fund the Plan for the employees of any company that might sign up. *Id.* ¶ 176. Total Financial needed those loans because its Plan required Total Financial to make a $15,000 loan to every worker it enrolled in the Plan, which Total Financial did not have the funds to do for larger companies. *Id.* ¶¶ 174-75. By the time Total Financial shut down in January 2017, however, Provision had never successfully signed a contract with a bank to provide loans for the employees it was finding for Total Financial. *Id.* ¶ 177-81.

Total Financial shut down due to a criminal investigation into its owner, Joachim, which ultimately resulted Joachim's conviction (as well the conviction of his wife and Total Financial itself) on federal conspiracy charges related to Total Financial's Plan. *Id.* ¶¶ 492-94; Ex. 159 to First Brody Decl.

After finding out about the investigation, Provision and ABC Group held a joint board meeting during which David and the boards agreed to draft a letter of intent for Provision to set up a new company with Joachim's cooperation, so that the health insurance add-on project could

4

continue to move forward.  SEC SUF ¶¶ 182-83.  J. Michael Kafes ("Kafes"), President of the Board of Directors of Provision, accordingly signed a "letter of intent" "offered as a binding pledge" to Joachim, stating Provision's intent to establish "a new LLC" as a replacement for Total Financial's Plan and averring that Provision doing so "would be under the complete agreement that when [Joachim] [is] vindicated . . . then [Joachim] will be able to come into this new company and take it over with full control of the entity as the absolute managing partner."  *Id.* ¶¶ 184-85 (quoting Ex. 87 to First Brody Decl. ("Letter of Intent")).  Kafes believed that this Letter of Intent was binding on Provision and would also be binding on the new company to be formed.  *Id.* ¶ 186.

The new company Provision and David formed was Premier.  *See id.* ¶¶ 189-94.  Soon after its formation, Premier agreed to pay Joachim a "royalty" of at least $12,000 per month pursuant to a consulting agreement.  *Id.* ¶ 197.  In February 2018, Premier and Joachim amended the consulting agreement, with Premier increasing the minimum monthly royalty payment Joachim would receive in exchange for Joachim signing a document stating that Joachim was only a "junior partner" for a patent application on a so-called "self-liquidating bank loan process" and providing that David personally would make all decisions on the "use of the patent" designed by David.  *Id.* ¶ 203.[4]

Upon David and Provision's formation of Premier, Premier was to be managed by Provision's board of directors (as a temporary board) and by David.  *Id.* ¶ 206.[5]  As of November 2024, Premier had never had an independent board from Provision.  *Id.* ¶ 207; Ex. 98 to First Brody

---

[4] And, later in 2018, after Total Financial, Joachim, and Joachim's wife were indicted in connection with the Total Financial Plan, Premier and Joachim entered into an addendum to that consulting agreement, increasing Joachim's minimum royalty payment to $20,000 per month.  *Id.* ¶¶ 204-05.
[5] In, at minimum, 2013 and 2020, Provision's Board of Directors consisted of Alison David, Michael Kafes, Calvin Suechting (a.k.a. Calvin Sterling), Michael McCoy, and Dan Rose.  *Id.* ¶¶ 155-56.

Decl. David's official title at Premier was "Assistant to the Board President and Advisor to the Board." SEC SUF ¶ 208.

## B.    David's Criminal and Regulatory History[6]

In 2015, before Premier's formation, David changed his name from his birth name, Dennis Lee. *Id.* ¶¶ 1-3. While known by his birth name, David was convicted of ten felonies, arrested numerous times, sued by nine states for violations of state securities and/or consumer protection laws, had five states issue public warnings about him, and entered into a stipulated order for a permanent injunction and final judgment based on Federal Trade Commission ("FTC") charges. *E.g.*, *id.* ¶¶ 4, 5, 8, 14-17, 22, 24, 26, 34, 61, 67, 70, 73, 81, 93, 100-05.

David was first convicted of a felony in 1975, when he was found guilty of a felony fraud charge in New Jersey. *Id.* ¶¶ 4-5.

David next turned to promoting "free energy" or "free electricity" devices, embarking on multiple national tours stopping in every state to promote those devices, thereby becoming "well known." *Id.* ¶¶ 11-13 (quoting Ex. 8 to First Brody Decl. (SEC Deposition of David)). David claims that it "was prophesied over [him] . . . that [he] was going to change the field of energy" and that, accordingly, "God . . . revealed to [him] how to use [his] heat pump to take low grade energy out of the air and use it to make" "electricity that is produced without any cost for fuel." *Id.* ¶¶ 9-11 (quoting Exs. 7 & 17 to First Brody Decl.). In May 1990, David pled guilty to eight counts of violating California's Seller's Assisted Marketing Plan Act in connection with his

---

[6] David's history of interactions with regulators and the criminal justice system is, to say the least, extensive (as evidenced by the 32 pages the SEC devoted to that history in its SUF). For the purposes of this Opinion, the Court finds summarizing the most relevant interactions and outlining the contours of David's history sufficient to adequately address the SEC's argument that Premier and David made actionable omissions in the materials they sent to investors when they did not disclose David's involvement in the management of Premier or his criminal and regulatory history.

marketing of a heat pump which he purported generated electricity, for which he was sentenced to serve three years and four months in prison. *Id.* ¶¶ 14-19.

David continued to promote "free electricity" products after his release from prison, explaining in his own words, "The day I got out I walked across the street and did a national radio show on how to make free electricity from a phone booth." *Id.* ¶ 20. In 2004, David pled guilty, by way of Alford plea, to the felony charge of "Criminal Attempt to Fail to Register Business Opportunity" in Kentucky, *id.* ¶¶ 26-28, which the Supreme Court of Kentucky found "directly related to [David's] corporate entities" engaging "in the promotion and sale of business opportunities of various products, including a device that supposedly produces free electricity," *id.* ¶ 21; *Lee v. Ryan*, Crim No. 2002-SC-1057-MR, 2003 WL 21357609, at *1-3 (Ky. June 12, 2003), *as modified* (Sept. 18, 2003).

On top of his criminal convictions, David admits that he has an "extensive" regulatory history. SEC SUF ¶ 29 (quoting Ex. 6 to First Brody Decl. (David's Answer to Complaint)). Authorities in David's home state of Washington, for instance, have brought four civil actions against him, with: (1) the Attorney General enjoining him in 1985 for violations of the Consumer Protect Act, Retail Installment Sales Act, and Federal Truth in Lending Act committed in connection with a solar energy savings program, (2) the Securities Division of the Washington State Department of Financial Institutions issuing a cease and desist order against David in 1999 stating that there was reason to believe he had violated the Securities Act of Washington by, *inter alia*, failing to disclose his regulatory history and misrepresenting his criminal history, (3) the state bringing a complaint against him under its Unfair Business Practices Consumer Protection Act, which led to a 2002 judgment and injunction being entered against him prohibiting him from selling products, services, or business opportunities to Washington residents until the judgment

7

was satisfied, and (4) the state also filing a Petition for the Enforcement of Judgment and Decree in 2006 based on a presentation David made in the state in violation of the 2002 injunction, which resulted in a grant of summary judgment against him and an order requiring David to pay the monies outstanding under the 2002 judgment, post-judgment interest, and additional penalties (which he has never paid). *Id.* ¶¶ 34, 39-59.

Outside of Washington, David has been subject to: (1) a 1999 cease and desist order in Alabama for violating the Alabama Securities Act by offering unregistered or non-exempt securities, (2) a 2001 permanent injunction in Tennessee prohibiting him from conducting any business in violation of the Tennessee Securities Act after the state filed an action against him for allegedly failing to tell potential investors about his prior involvement in legal proceedings, (3) a 2002 temporary injunction in Kentucky (related to his criminal charges in Kentucky) prohibiting him from conducting business in Kentucky unless he had received the approval of the Attorney General of Kentucky to do so, (4) a 2003 consent decree with the Attorney General of Idaho permanently enjoining him from selling or advertising goods or services in the state, (5) a 2003 final judgment, after a grant of summary judgment against him, in Alaska permanently enjoining David from promoting in the state, *inter alia*, any services "related to products for which scientific or technological claims are made, unless there is competent and reliable scientific evidence that substantiates the claims" after claims of false and deceptive advertising violating the Alaska Unfair Trade Practices and Consumer Protect Act were brought against him, (6) a 2003 consent judgment with the State of Maine resolving a lawsuit under the Maine Unfair Trade Practice Act for promoting a fraudulent scheme to investors, (7) a 2004 administrative proceeding in Mississippi related to Mississippi's security act, (8) a 2004 stipulated judgment with the State of Oregon enjoining him from offering or selling unregistered securities after an Oregon state court found

him in contempt of court for willfully violating the terms of an Assurance of Voluntary Compliance David had signed to avoid a lawsuit from the state, and (9) a 2005 permanent injunction in Vermont prohibiting him from advertising, promoting, or selling goods or services in the state after a trial court granted the state summary judgment against him for violating the Vermont Consumer Fraud Act. *Id.* ¶¶ 24-25, 61-62, 66-69, 70, 72-73, 77, 81, 84-87, 91-94, 96.[7]

David has also attracted the attention of federal regulators.  In 2011, the FTC and David entered into a stipulated order for a permanent injunction and final judgment based on charges that David and his companies had engaged in "deceptive acts or practices in connection with the promotion of [a] 'hydro assist fuel cell' kit." *Id.* ¶¶ 112, 115.  Under the terms of the order, David and his companies were enjoined from advertising or promoting any product purported to reduce energy consumption, generate energy, reduce energy consumption, or increase vehicle gas mileage, fuel economy, or fuel efficiency. *Id.* ¶ 115.[8]

## C.    Premier's Efforts to Raise Money

After David—having changed his name— and Provision formed Premier, they determined that Premier needed funding to set up its operations. *Id.* ¶ 263.  Premier accordingly filed a Form D "notice of exempt offering securities" ("Form D") with the SEC on August 9, 2017—allowing it to sell up to $1 million of unregistered equity securities under Securities Act Rule 504(b)(1), 17

---

[7] Additionally, while they did not file lawsuits against David, the states of Wyoming, Arkansas, Iowa, Minnesota, and North Carolina issued warnings to consumers about David. *Id.* ¶¶ 100, 102-05.  Wyoming, for example, urged "extreme caution" to anyone considering David's "free energy" offer. *Id.* ¶ 100 (quoting Ex. 51 to First Brody Decl.).

[8] David was also required to provide an annual sworn report to the FTC detailing his employment status, describing any business with which he was affiliated, and outlining his duties and responsibilities in connection with his employment or business activities. *Id.* ¶ 119.  In his first such report, David explained that he had adopted a "non-deplume," Josiah David, instead of using his original name (Dennis Lee), because he had been encountering "a problem that was interfering with his performance": that "many" sales professionals recruited by David "disengaged from their relationship" "when they researched Lee's name." *Id.* ¶ 120.

CFR § 230.506(b)(1)—and an amended Form D on May 25, 2018—allowing it to sell up to $5 million of the same unregistered equity securities.  *Id.* ¶¶ 268-69.

Premier did in fact raise the (approximately) $5 million for which it had filed an amended Form D by selling "ownership units" to over 150 investors.  *Id.* ¶¶ 282-83 (citing Ex. 35 to First Brody Decl.).

To convince individuals to buy these ownership units in Premier, David first spoke with those prospective investors, typically for approximately two hours.  *See id.* ¶¶ 273, 284.  "Only David spoke with investors and [David] had the ultimate authority over the statements made. . . ." *Id.* ¶ 272 (quoting Ex. 6 to First Brody Decl. (David's Answer to Complaint)).  David did not allow anything that he had not personally reviewed to be sent out to prospective investors.  *Id.* ¶ 285.

After David had spoken to the prospective investors, his wife, Alison David, would send them written materials via email.  *Id.* ¶¶ 217, 284.[9]  Premier sent out five different sets of written materials to prospective investors from 2017 to 2021.

David authored each of the documents in the first packet of materials sent to prospective investors, which included, *inter alia*, memoranda titled: "Introduction to the Partnership Investment Packet," "The Premier 105 Plan A Solution to Obamacare," "Supporting Documents Page," and "Why are we raising Five million dollars to set up Premier Partners?"  Ex. 114 to First Brody Decl. (collectively, the "Initial Investment Packet"); SEC SUF ¶¶ 286-87.

Premier then revised the Initial Investment Packet in November 2017, Ex. 94 to First Brody Decl. (the "November 2017 Investment Packet"), reducing the number of attachments to nine as a

---

[9] David himself did, at least on one occasion, send written materials to prospective investors.  *See id.* ¶¶ 385-86 (citing Ex. 144 to First Brody Decl.).

"second try" to make this set of materials for prospective investors "more simple and not as complicated." Ex. 86 to First Brody Decl. at 128:9-21; SEC SUF ¶ 299-300.[10]

The November 2017 Investment Packet was subsequently replaced by a single, more professional document drafted in January and February 2018. Ex. 135 to First Brody Decl. (the "January 2018 Informational"); SEC SUF ¶¶ 316, 319-20, 322, 324, 327, 350. Premier hired Roy Lanza ("Lanza") as the company's Executive Vice President ("EVP")—on David's recommendation after David interviewed him and negotiated the terms of his employment—to draft this January 2018 Informational. SEC SUF ¶¶ 316-18. David "explicitly" told Lanza that David "wanted to start attracting . . . more sophisticated investors," and Lanza understood that the June 2018 Informational was created to attract these more sophisticated investors. *Id.* ¶ 320; Ex. 112 to First Brody Decl. at 53:8-54:5. Because Lanza was new to the company when he drafted this January 2018 Informational, he "was 100 percent relying on . . . David to make sure that all the information in the [January 2018] Informational was correct because [he] had no other sources . . . for the most part." Ex. 102 to *id.* at 59:17-25; *see* SEC SUF ¶ 326. As well as personally providing Lanza the information to include in the January 2018 Informational, David directed Alison David to send Lanza relevant materials. *See* SEC SUF ¶¶ 327-28.[11] David made many revisions to the January 2018 Informational initially drafted by Lanza. SEC SUF ¶ 345.[12] Premier

---

[10] Premier also sent the November 2017 Investment Packet to existing investors in an email sent under David's name. SEC SUF ¶¶ 301, 303.

[11] Lanza testified at deposition that he expressed to David his "concerns with the information" in the January 2018 Informational "being accurate," leading to Lanza telling David that "the board and legal must review this." Ex. 102 to First Brody Decl. at 90:5-12; *see* SEC SUF ¶ 338.

[12] After Lanza sent a revised draft of the January 2018 Informational to David after David had provided him edits, David asked Lanza via email, "Did you just agree with me and make all the changes or just do what you thought worked after my advice?" *Id.* ¶ 343 (quoting Ex. 133 to First Brody Decl.); *see id.* ¶¶ 340-43. Lanza replied, "Yes, I made all of your changes." *Id.* ¶ 343 (quoting Ex. 133 to First Brody Decl.).

sent the final version of the January 2018 Informational, which David also described during a February 26, 2018, investor meeting as "classed up" and "very professional," to a group of prospective and existing investors. *Id.* ¶ 353 (quoting Ex. 84 to First Brody Decl.), ¶ 350.

In May 2018, David revised the January 2018 Informational to add a new section. Ex. 138 to First Brody Decl. (the "May 2018 Informational"); SEC SUF ¶¶ 362-63, 365. Premier sent the May 2018 Informational to prospective investors with a cover email stating that the new section had unintentionally been left out of the January 2018 Informational. *See* SEC SUF ¶ 368.

Later that month, William Lipkus ("Lipkus"), Premier's new CEO, started revising the May 2018 Informational, with David providing some, "if not the bulk," of the information necessary for that revision. *Id.* ¶¶ 369, 372-73, 377 (quoting Ex. 15 to First Brody Decl.). This revised version, Ex. 140 to First Brody Decl. (the "June 2018 Informational"), was edited by David before being finalized on June 8, 2018, and sent out to prospective investors. SEC SUF ¶¶ 376, 378, 381. Premier used the June 2018 Informational from June 2018 until May 2021. *Id.* ¶ 389.[13]

It is in these five sets of materials—the Initial Investment Packet, the November 2017 Investment Packet, the January 2018 Informational, the May 2018 Informational, and the June 2018 Informational (collectively, the "Investment Materials")—that Defendants made the alleged

---

[13] While Defendants claim in their RSUF that the "[t]his Informational (June 2018) was not used at this time" and that it "was not used to solicit investors," *see* ¶¶ 389, 491, the Court has deemed this fact admitted (even when the evidence is viewed in the light most favorable to Defendants) given that Defendants do not cite any record evidence in their unsworn RSUF to support this claim, nor do they support this claim with evidence elsewhere in their Opposition brief, Declarations, or Exhibits. Furthermore, in the paragraph directly following one in which they claim the June 2018 was not used from June 2018 to May 2021, Defendants explicitly "concede[]" as "undisputed" that "David, on behalf of Premier, testified, [that the June 2018 Informational] 'was used to the end and there was no reason for it not to be.'" *See* Defs. RSUF ¶ 390; SEC SUF ¶ 390.

misrepresentations and omissions that are the subject of the SEC's Complaint and this Motion. *See, e.g.*, Mot. at 10-22.[14]

### D.    Procedural History

The SEC filed this civil enforcement action against Defendants Premier and David and Relief Defendants Provision and Joachim on May 19, 2021.  Compl.  The SEC's Complaint asserts two counts of securities fraud against Defendants: one under Section 10(b) and Rule 10b-5 thereunder (First Claim for Relief) and the second under Section 17(a) (Second Claim for Relief). *Id.* ¶¶ 115-20.  Both claims against Defendants arise from Defendants' allegedly false and misleading statements to prospective purchasers of "ownership units" in Premier regarding the company's management, banking relationships, intellectual property, and legal opinion letters regarding its business.  *Id.*[15]

David answered the Complaint on August 13, 2021.  D.E. 16.  On September 2, 2021, David—then appearing *pro se*—moved to dismiss the Complaint for failure to state a claim for which relief can be granted under Fed. R. Civ. P. 12(b).  D.E. 24.  The Court administratively terminated David's motion to dismiss on September 6, 2021, because David had made his motion after filing his answer to the Complaint.  D.E. 26.

Joachim and Premier answered the Complaint on September 30, 2021, in D.E. 31, and October 13, 2021, in D.E. 32, respectively.  As of the time of filing of this Opinion and Order, Provision has not answered the Complaint.  *See* Dkt.

---

[14] Given the significant overlap between the factual bases for the numerous statements the SEC alleges are false or misleading in violation of the laws against securities fraud, on one hand, and the application of the elements of securities fraud to those statements, on the other, the Court sets forth in the Analysis section, rather than in this Background section, the facts most directly relevant to determining whether a particular statement constitutes securities fraud.

[15] While the SEC has also brought an unjust enrichment claim against Relief Defendants, *id.* ¶¶ 121-29, it has not moved for summary judgment on that claim against Relief Defendants.  *See* Mot. at 1.

On February 16, 2024, at the tail end of a lengthy discovery process, the Court set a briefing schedule for summary judgment motions and referred the case to mediation. D.Es. 95-96. After the apparently unsuccessful mediation, the Court, on June 18, 2024, amended the briefing schedule for the SEC's motion for summary judgment and allowed Defendants to submit amended discovery responses. D.E. 103. The Court next denied the SEC's request for leave to file excess pages for its motion for summary judgment, D.E. 105, before granting a final extension of the briefing schedule, D.E. 107.

On November 1, 2024, the SEC and Defendants simultaneously filed their summary judgment papers. *See* D.E.s 111-22. The SEC first filed (1) its notice of motion for summary judgment, D.E. 108, (2) its brief in support of its motion, D.E. 109,[16] (3) its SUF, D.E. 110, (4) the First Brody Declaration and Exhibits 1-100 thereto, D.E. 111, (5) Exhibits 101-60 to the First Brody Declaration, D.E. 112, and (6) Exhibits 160-210 to the First Brody Declaration, D.E. 113. Defendants initially filed their brief in opposition to the Motion and exhibits thereto as D.E. 114, but the signatures on the brief were deficient under this District's Local Rules and the exhibits were not properly uploaded. *See* D.E. 122. Defendants accordingly re-filed (that same day) their brief in opposition to the Motion as D.E. 122-1 (to which this Opinion refers to as "Opp." or "Opposition" throughout)[17] and the exhibits thereto as D.Es. 122-2, 122-3, 122-4, and 122-5. Defendants also filed (1) their RSUF, D.E. 115, (2) the Montemurro Declaration, D.E. 116, (3) the Kafes Declaration, D.E. 117, (4) the First David Declaration, D.E. 118, and (5) the Second David Declaration, D.E. 119. Finally, the SEC filed its Reply brief, D.E. 120, and a Declaration of Todd D. Brody ("Second Brody Decl.") and Exhibits 1 and 2 thereto, D.E. 121.

---

[16] The SEC's brief is referred to as the "Motion" or "Mot." throughout. *See supra* n.1.

This case was reassigned to the undersigned on November 18, 2024.  D.E. 123.

## II.    LEGAL STANDARD

### A.    Summary Judgment

A court may grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party.  *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A factual dispute is "material" if it might affect the outcome of the case under governing law.  *Id.*  (citing *Anderson*, 477 U.S. at 248).

The movant bears the initial responsibility to establish the basis for the motion for summary judgment and to identify the portions of the record that demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

After the moving party has met its initial burden, the non-moving party must set forth specific facts showing that there is a genuinely disputed factual issue for trial by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, . . . admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c).

Under Rule 56, a court must view the evidence presented in the light most favorable to the non-moving party.  *See Anderson*, 477 U.S. at 255.  However, "conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment," *Blair*, 283 F.3d at 608, as are unsworn statements in memoranda and unsupported statements in pleadings, *Schoch v. First Fidelity Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990).

Even where the movant bears the burden of persuasion at trial, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

### B.    Securities Fraud

The SEC has brought claims against Premier and David under: (1) Sections 17(a)(1)-(3) of the Securities Act, and (2) Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.  Compl. Together, Section 10(b) and Rule 10b-5 thereunder and Section 17(a) prohibit fraudulent conduct in connection with the offer, purchase, or sale of securities.  *See* 15 U.S.C. §§ 77q(a), 78j(b); 17 C.F.R. § 240.10b-5.[18]

The elements required to prove violations of Section 10(b) and Rule 10b-5 thereunder and those required to prove violations of Section 17(a) are "essentially the same."  *SEC v. Gu*, No. 21-17578, 2024 WL 4100369, at *8 (D.N.J. Sept. 6, 2024) (quoting *SEC v. Desai*, 145 F. Supp. 3d 329, 335 (D.N.J. 2015), *aff'd*, 672 F. App'x 201 (3d Cir. 2016)).[19]

Accordingly, to prevail on its securities fraud claims here, the SEC must prove that:

> (1) the defendant[s] made a misrepresentation, or an omission where there was a duty to speak, or used a fraudulent device; (2) the

---

[18] Section 10(b) prohibits fraudulent conduct in connection with the *purchase or sale* of securities. Section 17(a) does the same in the connection with the *offer or sale* of securities.  *Id.*

[19] The two differences among the elements of any of the SEC's claims against Defendants are immaterial to the disposition of this Motion.  *First*, while the SEC need not establish scienter to prove violations of Sections 17(a)(2) or (3) because negligence is sufficient, unlike in actions under Section 17(a)(1) and Section 10(b) and Rule 10b–5 thereunder, *Aaron v. SEC*, 446 U.S. 680, 701-02 (1980), the Court finds that the SEC has in fact established scienter here, *see, e.g., infra* Section III.A.1.  There is therefore no need for the Court to undertake a separate negligence inquiry under Sections 17(a)(2) or (3).  *Second*, while only claims under Section 17(a)(2) additionally require that the person offering or selling securities "*obtain money or property* by means of an untrue statement of a material fact or any omission to state a material fact," 15 U.S.C. § 77q(a)(2) (emphasis added), the Court also concludes that Defendants obtained $5 million from investors by means of the misrepresentations Defendants made to those investors, *see supra* Section I.C; *infra* Section III.  Given this finding, the Court need not separately analyze the SEC's 17(a)(2) claim.

misrepresentation or omission was material; (3) the defendant[s] made the misrepresentation or omission with scienter; (4) the defendant[s] made the misrepresentation or omission in connection with the [offer, purchase, and/or] sale of a security; and (5) the defendant[s] made the misrepresentation or omission in connection with interstate commerce or the mails.

*Desai*, 145 F. Supp. 3d at 335 (citing *SEC v. First Jersey Sec.*, 101 F.3d 1450, 1467 (2d Cir. 1996) and *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1417 (3d Cir. 1997)).

## III.    ANALYSIS

The SEC alleges that Defendants have violated Section 10(b) and Rule 10b-5 thereunder and Section 17(a) by making false or misleading statements regarding Premier's management, banking relationships, patents, and legal opinion letters. *See generally* Compl. While the SEC has alleged that Defendants have made several false or misleading statements regarding each of these topics, the SEC need only prove that Defendants made a single false or misleading statement that violates these securities fraud laws to prevail on summary judgment as to liability. *See* Compl. (bringing just two claims for relief against Defendants, one under Section 10(b) of the Exchange Act and Rule 10b-5 thereunder and the other under Section 17(a), each based on allegations that Defendants made "one or more" false or misleading statements). The Court has nevertheless analyzed each of the misrepresentations and omissions alleged by the SEC to assist the Court and the parties in determining what any appropriate relief might be, as well as for clarity and completeness. As explained below, the Court finds that the SEC has sufficiently proven that Defendants made one or more actionable false or misleading statements and is therefore entitled to summary judgment against the Defendants as to liability.[20]

---

[20] Defendants argue that summary judgment is prohibited by the Supreme Court's decision in *SEC v. Jarkesy*, 603 U.S. 109 (2024). *See* Opp. at 9-11. They are incorrect. In *Jarkesy*, the Supreme Court extended the right to a jury trial under the Seventh Amendment to defendants, like those here, against whom the SEC seeks civil penalties for securities fraud. *Jarkesy*, 603 U.S. at 121.

The Court begins by disposing of the issues common to all of Defendants' alleged misrepresentations or omissions, and then considers each alleged misrepresentation or omission in turn.

The Court first finds that the ownership units Premier sold to investors are "securities" within the meaning of Section 10(b) and Rule 10b–5 thereunder and Section 17(a).  Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act defines the term "security" to include investment contracts.  An investment contract, in turn, is "(1) 'an investment of money,' (2) 'in a common enterprise,' (3) 'with profits to come solely from the efforts of others.'"  *SEC v. Infinity Group Co.*, 212 F.3d 180, 187 (3d Cir. 2000) (quoting *SEC v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946)).  As the SEC persuasively argues, *see* Mot. at 26-27, and Defendants do not dispute, the Premier ownership units are investment contracts because investors invested money in Premier, a common enterprise, and the investors were led to expect that those investments would earn profits from the efforts of Premier's management.[21]

---

As the SEC points out, the Supreme Court did not, however, by implication or otherwise, bar courts from entering summary judgment against such defendants, as these Defendants appear to be claiming. *See id.*; Reply at 12.  Just as in the innumerable other contexts in which defendants have a right to a jury trial, courts like this one therefore retain the ability to enter summary judgment against defendants like these in securities fraud actions seeking civil penalties post-*Jarksey*. *See Conklin v. Anthou*, 495 F. App'x 257, 261 (3d Cir. 2012) (finding that granting summary judgment against a party does not deprive that losing party of its Seventh Amendment trial right and characterizing *Ortman v. Thomas*, 99 F.3d 807, 811 (6th Cir. 1996) as "describing the argument [that it does] as 'patently meritless'"); *cf. Windish v. 3M Co.*, No. 24-1904, 2025 WL 572386, at *2 (3d Cir. Feb. 21, 2025) ("The Seventh Amendment does not guarantee that [a] case will make it all the way to trial.").

[21] For the avoidance of doubt, the Court also finds—and Defendants do not dispute—that the misrepresentations outlined in this Section, *infra*, were all made "in connection with the offer, purchase, and/or sale of [this] security," *Desai*, 145 F. Supp. 3d at 335, given that they were made in the Investment Materials sent to prospective investors and intended to influence those prospective investors. *See, e.g.*, *SEC v. Strategic Glob. Invs., Inc.*, 262 F. Supp. 3d 1007, 1021 (S.D. Cal. 2017) (material misstatements and omissions were made "in connection" with the purchase or sale of a security where made in "press releases that were publicly disseminated and intended to influence potential investors").

Nor is there any dispute that Defendants sent the Investment Materials containing Defendants' alleged misrepresentations and omissions to investors via email, *see* SEC SUF ¶ 217; Exs. 94, 114, 135, 138, 141 to First Brody Decl., and therefore used the means and instrumentalities of interstate commerce in making those alleged misrepresentations and omissions. *See Gu*, 2024 WL 4100369, at *11.

The SEC has also sufficiently established that the Defendants "made" the allegedly false or misleading statements such that Defendants may properly be held responsible. "More than one person or entity may have authority over a statement and therefore may be considered the maker of a false statement or responsible for a material omission." *City of Pontiac Gen. Employees' Retirement Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 374 (S.D.N.Y. 2012). Defendants admit that David had "ultimate authority over the statements made" in the Investment Materials, SEC SUF ¶ 272 (quoting Ex. 6 to First Brody Decl. (David's Answer to Complaint)).[22] And Premier also had the required authority over the statements as the company on whose behalf David made the statements in the Investment Materials.[23] *See, e.g.*, *In re Cannavest Corp. Sec. Litig.*, 307 F. Supp. 3d 222, 240 (S.D.N.Y. 2018) (holding that both the signer of filings and the company issuing the filings could "be held responsible for statements in the[] materials"); *SEC v. Lottonet Operating Corp.*, No. 17-21033, 2017 WL 6949289, at *12 (S.D. Fla. Mar. 31, 2017), *report and recommendation adopted*, 2017 WL 6989148 (S.D. Fla. Apr. 6, 2017) (both company and principal

---

[22] The undisputed evidence further demonstrates that David did not allow anything that he had not personally reviewed to be sent out to prospective investors. *Id.* ¶ 285. David also authored the Investment Packets and the new section in the May 2018 Informational, as well as provided the information for, reviewed, edited extensively, and approved the January and June 2018 Informationals. See *supra* Section I.C.

[23] Premier's name and logo appear on all of the Investment Materials (as do David's initials). *See* Exs. 94, 114, 135, 138, 140 to First Brody Decl. The Premier board also authorized the creation of the Informationals. *See* SEC SUF ¶ 318 (citing Ex. 205 to First Brody Decl.).

of company were "makers of the false statements and omissions" in private placement memorandum and Form D filing).

Accordingly, the remaining questions before the Court—which track the first three elements of the SEC's claims—are: (1) whether Defendants made misrepresentations or omissions, (2) whether any misrepresentations or omissions Defendants made were material, and (3) whether Defendants made any of those material misrepresentations or omissions with scienter.

The Court will now address each of the outstanding questions involving these three elements for each of the alleged false or misleading statements in turn.  As explained below, the Court holds that no reasonable jury could find in favor of Defendants on any of those elements based on the undisputed material facts in the record, as the SEC has sufficiently proven that Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder and Section 17(a) in making one or more false or misleading statements.  While such a finding as to one false or misleading statement would be sufficient to establish liability here, *see supra*, the Court finds that Defendants made one or more false or misleading statements with regards to *each* of the *four* topics about which the SEC alleges Defendants made unlawful statements: Premier's (1) management, (2) relationships with bankers, (3) patents, and (4) legal opinion letters regarding its business.

### A.    Representations Regarding Premier's Management

The SEC alleges that Defendants omitted four material pieces of information regarding Premier's management from the Investment Materials they disseminated to prospective investors: (1) that David was involved in Premier's management and had a criminal and regulatory history, (2) that Premier board members had been previously associated with David's "free energy" companies, (3) that Provision/Premier had sent a Letter of Intent to Joachim  "as a binding pledge" that Joachim would be able to take control of Premier when he was "vindicated," and (4) that Kafes

had filed for bankruptcy. Mot. at 10-12. The SEC further argues that these misrepresentations were material and made with scienter. *Id.* at 30-37. The Court determines that Defendants are liable for one such type of management-related misrepresentation: the omission of David's involvement in management and criminal and regulatory history. The Court also concludes, however, that the SEC has not proven that the other three types of management-related misrepresentations are actionable under the securities fraud laws.

1.    *Omission of David's Involvement in Management and Criminal/Regulatory History*

The SEC first alleges that it was, "at the very least, misleading" for the January 2018 Informational, the May 2018 Informational, and the June 2018 Informational (collectively, the "Informationals") to "falsely conceal[] David's management role" by omitting any mention of David, much less his criminal and regulatory history, in the sections purporting to identify the Premier's management team. Mot. at 11, 27-28. The SEC argues that this alleged concealment was "compounded by [Defendants'] touting" of, in all three Informationals, Premier's management as "high-performance team," its "commit[ment] to doing business with integrity and respect for people and the world," its view that a "critical success factor[]" for the company was hiring the "highest quality people," and, in the January and May 2018 Informationals, touting of the company "always find[ing] and hir[ing] the highest quality people." Mot. at 28; SEC SUF ¶¶ 392, 393, 466, 473. The Court agrees that it was misleading for Defendants to omit from the Informationals David's involvement in Premier's management as well as criminal and regulatory history while also touting Premier's management, and further concludes that this omission was material and made with scienter.

There is no dispute—much less a genuine one—that David is not mentioned in any of the sections of the Informationals describing Premier's management team. SEC SUF ¶¶ 403, 466,

471-72.  Nor is there any dispute that the Informationals did not mention that David was previously known as Dennis Lee or that he had a prior criminal and regulatory history as Dennis Lee.  *Id.* ¶¶ 405, 466, 472, 474.  In fact, David's name only appears in the Informationals in instructions as to who to contact for further information, and the Informationals are devoid of any other reference to him aside from his initials ("JD") appearing on their covers.  *Id.* ¶¶ 404, 466, 472.

While Defendants do not dispute that the Informationals do not describe David as part of Premier's management, they do dispute the import of this omission, arguing that David was not a member of the company's management.  *See* Opp. at 5-6.  A review of the record evidence, however, reveals that Defendants have not shown that there is a genuine dispute that David was functionally part of Premier's management.  The undisputed evidence before the Court is that: (1) Premier's operating agreement provided that Premier was to be managed by David along with Provision's board (which was identical in composition to Premier's board), SEC SUF ¶¶ 206-07; (2) David put in 60 to 80 hours a week to support Premier, *id.* ¶ 209; (3) David reported to Premier's board that he was "the creator of the technology and it is all what the world would call [his] brain child," he "directed all operations and [was] solely responsible for all aspects of the Premier Alternative (PA) program," he "ran marketing and sales efforts," he "developed the funding mechanism for [the] original operation," and he "raised all the capital [Premier] [had] needed in two hour conversations with hundreds of potential partners" (among other responsibilities), *id.* ¶ 210 (quoting Ex. 100 to First Brody Decl.); (4) Premier had no formally appointed executives or officers until it hired Lanza as EVP in January 2018, who reported to David[24] and was kept "totally in the dark" about Premier's finances by David and Premier, SEC

---

[24] In fact, in their RSUF, Defendants suggest that Lanza was "in training only, not [an] actual officer[]."  *See* ¶ 214.

SUF ¶¶ 212, 214-15 (quoting Ex. 103 to First Brody Decl.); (5) Lanza "of course" viewed David as part of Premier's management and considered David the "head manager of the entire Premier Healthcare organization;" *id.* ¶ 216; Ex. 102 to First Brody Decl. at 79:4-8;  (6) after Premier hired Lipkus to be the company's CEO, David directed Lipkus's efforts, Lipkus reported to David and Alison David, and Lipkus "[a]bsolutely" considered David to be part of Premier's management because "JD [David] was Premier;" SEC SUF ¶¶ 221, 223-25 (quoting Ex. 106 to First Brody Decl.); (7) Lanza testified that after Lipkus had been hired as CEO, David still ran the company, *id.* ¶ 230; (8) in June 2018, David emailed an attorney, "I pretty much run it [Premier].  If you were to ask Mr. Kafes how any of this works, he would have to ask me"—a characterization Kafes testified was correct, *id.* ¶ 231 (quoting Ex. 108 to First Brody Decl.); and (9) David told Lipkus and Lanza that David was the acting CEO of Premier until the company went live and "would sometimes have an outburst that – he was running the company[;] . . . [he] was the true CEO, and until this organization launched, he was functioning in that capacity," a situation which Lanza memorialized in an email to Lipkus with the subject line "JD [David] said he is the CEO of Premier" in which Lanza also wrote, "as you know, we have no insurance coverage for that and we really are not yet acting in a management capacity because JD [David] and his wife are controlling everything at Premier," *id.* ¶¶ 232-35 (quoting Exs. 102, 106 & 109 to First Brody Decl.).

Defendants have, at best, shown a genuine dispute as to whether David was "solely responsible for the actions of Premier."  *See* Opp. at 5.  In their Declarations, Defendants describe the roles of David and his wife and assert that David "reported to the board and kept them apprised," First David Decl. ¶¶ 4-6, and that the boards of Premier and Premier hired David and his wife "for a specific task that they were uniquely qualified to perform, and to assist in the hiring

of executives and staff that would be trained to take over and run the business, [and] after the business is all set up and ready to on-board clients, the business will be turned over to the executives and staff to run," Kafes Decl. ¶¶ 3-6. But this dispute is not material because, as the SEC explains, its "theory of liability does not hinge on David's title or exercise of sole management responsibility," Reply at 4. Assuming, as the Court must for the purposes of this Motion, that David did report to Premier's board and that he was hired to, *inter alia*, train executives to take over the business once it was set up and ready to onboard clients does not create a genuine dispute as to the material fact that David was functionally a part of management, and in fact directed Premier's management, until the business was set up and ready to onboard clients (which has not happened to date).

There is also no genuine dispute that, even excluding this action, David had a criminal and regulatory history spanning, at minimum, from 1975 through 2011, including ten felony convictions, suits filed against him by nine states for violations of state securities and/or consumer protection laws, public warnings about him issued by five states, and a stipulated order for a permanent injunction and final judgment entered based on FTC charges. *See supra* Section I.B. Defendants' only argument on this point is that David's "history was 50 years old and not germane or admissible evidence in this matter," so "[a] jury would not be given the charge to consider this history as evidence." *See* Opp. at 5. Not so. The SEC's securities fraud charges are based, in part, on Defendants' *concealment* of David's criminal and regulatory history. As such, evidence of David's criminal and regulatory history is "admissible as intrinsic to the charged offenses—it [goes] straight to proving [Defendants'] fraud." *United States v. Diaz*, No. 21-1709, 2022 WL 4298338, at *2 (3d Cir. Sept. 19, 2022) (affirming admittance of evidence of defendant's past disciplinary actions to show that defendant "had concealed them from his clients" as proof of

24

defendant's scheme to obtain money by false or fraudulent pretenses) (citing *United States v. Green*, 617 F.3d 233, 248-49 (3d Cir. 2010)); *United States v. Salzano*, Crim No. 22-690, 2024 WL 866885, at *6 (D.N.J. Feb. 26, 2024) (admitting evidence of defendant's "concealed history" as intrinsic to claim that defendant had "defrauded consumers and investors by intentionally concealing material derogatory facts from his past").

Given that there is no genuine dispute that David was functionally a part of Premier's management and had the criminal and regulatory history outlined in Section I.B, *supra*, the Court now turns to the question of whether the omission of any discussion of David (and his criminal and regulatory history) in connection with the representations regarding Premier's management in the Informationals was misleading—which, in this case, also hinges on the materiality of the omission. "Once a company has chosen to speak on an issue—even an issue it had no independent obligation to address—it cannot omit material facts related to that issue so as to make its disclosure misleading." *Williams v. Globus Med., Inc.*, 869 F.3d 235, 241 (3d Cir. 2017) (citing *Kline v. First W. Gov't Sec., Inc.*, 24 F.3d 480, 490-91 (3d Cir. 1994) for the proposition that "encompassed within that general obligation [to speak truthfully] is also an obligation or 'duty' to communicate any additional or qualifying information, then known, the absence of which would render misleading that which was communicated"). And a statement or omission is material when there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic v. Levinson*, 485 U.S. 224, 231-32 (quoting *TSC Indus., Inc., v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). "Only if the established omissions [or misrepresentations] are so obviously important to an investor, that reasonable minds cannot differ on the question of materiality is the

ultimate issue of materiality appropriately resolved as a matter of law by summary judgment." *TSC Indus.*, 426 U.S. at 450 (internal quotation marks omitted).

Here, the Court finds that the facts Defendants omitted—that David was part of Premier's management team and that he had a criminal and regulatory history—are material as a matter of law, and therefore further finds that those omissions were misleading.

"Investors make decisions about whether to invest their money in a company, in part, based on the company's leadership." *SEC v. Blackburn*, 15 F.4th 676, 681 (5th Cir. 2021). Courts have accordingly repeatedly found that defendants' failures to disclose the involvement of key individuals in the management of companies were material to investors—even where those individuals did not have criminal or regulatory histories. *See, e.g.*, *SEC v. Airborne Wireless Network*, No. 21-1772, 2023 WL 5938527, at *21-22 (S.D.N.Y. Sept. 12, 2023) (granting summary judgment for SEC after determining that company's misrepresentations and omissions involving an individual's role in the company were "such a kind as to be inherently important to investors and so material"); *SEC v. Husain*, No. 16-3250, 2017 WL 810269, at *8 (C.D. Cal. Mar. 1, 2017) (holding that failure to disclose facts regarding a company's leadership was material under Section 17(a) and Rule 10b-5 because, "[o]ther than a corporation's financials, its leadership . . . would seem to be [among] *the most* important pieces of information available to an investor") (emphasis in original).

Courts have also found failures to disclose criminal convictions and/or regulatory histories of individuals material even where those individuals' involvement in the management of companies *was* disclosed to investors. *See, e.g.*, *SEC v. Batterman*, No. 00-4835, 2002 WL 31190171, at *8 (S.D.N.Y. Sept. 30, 2002) (finding that misrepresentations regarding defendant's "history of administrative and regulatory sanctions" as well as his "guilty plea and criminal

conviction . . . undoubtedly would have been material to an investor" and granting summary judgment for the SEC); *SEC. v. Scott*, 565 F. Supp. 1513, 1527 (S.D.N.Y. 1983), *aff'd sub nom. SEC v. Cayman Islands Reinsurance Corp.*, 734 F.2d 118 (2d Cir. 1984) (holding that a CEO's criminal record "would be of obvious importance to an investor"); *SEC. v. Prater*, 289 F. Supp. 2d 39, 52-53 (D. Conn. 2003) ("The failure to disclose anywhere on the websites or in other materials any information about [defendant's] extensive criminal history, including convictions for fraud, would certainly constitute a material omission which a reasonable investor might view as important in deciding whether to trust their money with [defendant] or his company.").

Applying the sound logic of the aforementioned cases to these facts, the Court finds that, although David styled himself as just an advisor to Premier's board, "[g]iven [his] extensive history of criminal and regulatory violations, disclosure of his significant participation in the company [even though his title was that of a "consultant"] would certainly have altered the 'total mix' of information available to a reasonable shareholder," *see SEC v. Enters. Sols., Inc.*, 142 F. Supp. 2d 561, 573 (S.D.N.Y. 2001), such that "the established omissions are so obviously important to an investor . . . that reasonable minds cannot differ on the question of materiality," *see TSC Indus.*, 426 U.S. at 450. *See Blackburn*, 15 F.4th at 681 (affirming grant of summary judgment in favor of SEC where district court found that failure of a defendant with criminal convictions to disclose his "key role" with company was material "[e]ven though [he] was not an officer" because "there is little doubt that a reasonable investor would have wanted to know [his] true identity" and disclosure of his role "might have mattered to investors for a number of reasons, including but not limited to his criminal convictions").[25]   And, given the importance of this

---

[25] While the materiality standard asks whether a fact "would have viewed by the *reasonable investor* as having significantly altered the 'total mix' of information," *Basic*, 485 U.S. at 231-32

information to a reasonable investor, these omissions made the disclosure and touting of Premier's management team misleading.

The Court also concludes that Defendants made these omissions regarding David's involvement in Premier's management and his criminal and regulatory history with scienter.

"Scienter is 'a mental state embracing intent to deceive, manipulate or defraud.'" *SEC v. Infinity Grp. Co.*, 212 F.3d 180, 192 (3d Cir. 2000) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)). Despite Defendants' assertion to the contrary, *see* Opp. at 7, "the scienter required for securities fraud includes recklessness." *Infinity Grp.*, 212 F.3d at 192. *See also Gu*, 2024 WL 4100369, at *10. Recklessness is defined as "an extreme departure from the standards of ordinary care . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Infinity Grp.*, 212 F.3d at 192 (citation omitted). Proving scienter in this context does not require direct proof that Defendants "set out with the intention to defraud or deceive," as Defendants claim. *See* Opp. at 7. Instead, "[a] defendant's intent can be inferred from his conduct," *Gu*, 2024 WL 4100369, at *10,

---

(emphasis added), rather than whether investors would have changed their investment decisions, the Court notes that several investors in Premier have submitted sworn affidavits averring that they would not have invested in Premier had they known about David's history, and that another investor requested that Premier return his investment because "[a] previous felony conviction and name change by JD, regardless of what it was for, should have been disclosed," SEC SUF ¶¶ 577-79 (quoting Ex. 192 to First Brody Decl.). And the undisputed evidence also demonstrates that David's history, if disclosed, would have impacted Premier's ability to execute its business plan—and thus would have been further important to investors. Kafes testified that he did not "believe that any bank would have loaned any company associated with [David] money" if David "had disclosed that he had spent a year in prison in California, had been criminally charge and convicted in the state of Kentucky, and was subject to numerous consent judgment in various states." Ex. 15 to First Brody Decl. at 202:15-212. An affidavit from Minnwest Bank, one of the banks David contacted about a partnership, supports Kafes's hypothesis, as the bank stated that had it "known about Mr. David's criminal and regulatory history, it is highly unlikely that the bank would have had any discussions with him or his company." SEC SUF ¶ 585 (quoting Ex. 149 to First Brody Decl.).

and, "[i]n a non-disclosure situation, any required element of scienter is satisfied where. . . the defendant had actual knowledge of the material information," *Fenstermacher v. Phila. Nat. Bank*, 493 F.2d 333, 340 (3d Cir. 1974).

Here, it is undisputed that David had actual knowledge of his own role in Premier's management and his own criminal and regulatory history. *See Prater*, 289 F. Supp. 2d at 54 ("[I]t seems obvious that [defendant] at the very least knew about his criminal record and knowingly did not include it on the website or in the other materials."). "When the defendant is aware of the facts that made the statement misleading, 'he cannot ignore the facts and plead ignorance of the risk.'" *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1094 (9th Cir. 2010) (quoting *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 704 (7th Cir. 2008)).  The undisputed facts concerning David's conduct also demonstrate that (1) David knowingly disregarded the danger that failing to disclose that information in the Informationals—which he reviewed, edited extensively, and approved—might mislead prospective investors, or (2) at the very least, that the danger of misleading those prospective investors was so obvious that he must have been aware of it.  David knew that his background would be relevant to investors, and, accordingly, at the Provision board meeting authorizing Premier's establishment in April 2017, told the board that Premier was "no longer dealing with a team of people who believe in Dennis Lee[,] [but] [was] now dealing with professionals and professional investors" and that "people could be shocked to learn that [he] was involved in free energy and that could be the reason they want every dime they put in [Premier] back."  SEC SUF ¶¶ 580-81 (quoting Ex. 90 to First Brody Decl.).  Moreover, as explained in n.8, *supra*, David told the FTC that he had adopted a "non-deplume," Josiah David, instead of using his original name (Dennis Lee), because he had been encountering "a problem that was interfering with his performance" in attempting to build a salesforce for Provision's predecessor company:

that "many" sales professionals recruited by David "disengaged from their relationship" "when

they researched Lee's name." *Id.* ¶ 120.  Nor is there any genuine dispute that David knew, more

broadly, the importance of providing investors with sufficient information to avoid violating the

securities laws, given that, in an email conveying a draft of the May 2018 Informational, Lipkus

wrote to David and Lanza:

> Keep in mind the following excerpt from Rule 504 of Regulation D
> (We filed Form D under this exemption): Even if a company takes
> advantage of an exemption from registration, a company should take
> care to provide sufficient information to investors to avoid violating
> the antifraud provisions of the securities laws.  This means that any
> information a company provides to investors must be free from false
> or misleading statements.  Similarly, a company should not exclude
> any information if the omission makes what is provided to investors
> false or misleading.

Ex. 139 to First Brody Decl.; SEC SUF ¶ 373.[26]

Accordingly, "although scienter is generally a question for a jury, no reasonable jury could

find that [David] possessed a good faith basis" for the omissions regarding his involvement in

management and his history.  *See SEC v. Chester Holdings, Ltd.*, 41 F. Supp. 2d 505, 525 (D.N.J.

1999); *Blackburn*, 15 F.4th at 681 (applying the rule that summary judgment "on a question of

intent . . . is appropriate when the undisputed evidence removes any doubt on that issue" in

---

[26] The Court agrees with the SEC that David's assertion that he "was told by legal counsel . . . that
if he had not had a felony conviction selling a security then he could sell this unregistered security,"
First David Decl. ¶¶ 14-15, does not create a genuine dispute of material fact as to Defendants'
scienter.  *See* Reply at 13-14.  David's purported receipt of legal advice on the legality of him
selling securities is completely beside the point.  The SEC's claim with respect to Defendants'
omission of David's criminal and regulatory history is that that omission constitutes a fraudulent
misrepresentation under Section 10(b) and Rule 10b-5 thereunder and Section 17(a), not that David
was not permitted to sell securities.

affirming grant of summary judgment where defendant "undeniably knew about [individual's] paramount role in [company] yet failed to disclose his name").[27]

The SEC has also established Premier's scienter. Because, as set forth above: (1) David made the omissions at issue, (2) was part of Premier's management, and (3) Premier's board authorized him (along with Lanza and Alison David) to create the Informationals, the Court imputes David's scienter to Premier. *See Roofer's Pension Fund v. Papa*, 687 F. Supp. 3d 604, 630 (D.N.J. 2023) ("The "most straightforward way' to impute scienter to a corporation is 'to impute it from an individual defendant who made the challenged misstatement.'") (quoting *Jackson v. Abernathy*, 960 F.3d 94, 98 (2d. Cir. 2020)); *SEC v. Cooper*, 142 F. Supp. 3d 302, 317 (D.N.J. 2015) (citing *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1106-07) (imputing scienter of individual defendant to companies he controlled); *SEC v. Mintz*, 723 F. Supp. 3d 386, 410 (D.N.J. 2024) ("readily imput[ing] conduct [of individual trader defendant] and scienter to [corporation]").[28]

Because there is no doubt that a reasonable jury would find that Defendants misleadingly omitted the material facts of David's involvement in Premier's management and his criminal and

---

[27] *See also*, *e.g.*, *Gu*, 2024 WL 4100369, at *9-10 (finding that the SEC had established scienter and granting summary judgment for the SEC); *SEC v. StratoComm Corp.*, 652 F. App'x 35, 38 (2d Cir. 2016) (affirming grant of summary judgment for SEC after agreeing "with the district court that there was no genuine dispute as to scienter on the record before it" because "[t]he record demonstrate[d] that [defendants] knew the statements at issue to be false when made"); *Airborne*, 2023 WL 5938527, at *26-27 (SEC had sufficiently proven defendant's scienter for the court to grant summary judgment against defendant where, *inter alia*, defendant "knew that . . . representations were false at the time they were made"); *SEC v. Honig*, No. 18-8175, 2023 WL 6386918, at *30 (S.D.N.Y. Sept. 29, 2023) ("[A] defendant's denial of intent will not defeat summary judgment where the facts he misrepresented were all known to him at the time") (citing *SEC v. Frohling*, 851 F.3d 132, 138 (2d Cir. 2016)).

[28] Given that the Court has imputed David's scienter to Premier, it need not address the SEC's arguments (1) that Alison David, a Premier board member and David's wife, acted with scienter when she distributed the Informationals to prospective investors on Premier's behalf and (2) that her scienter may be imputed to Premier. *See Mot.* at 40.

regulatory history from the Informationals and that Defendants did so with scienter, the SEC has established liability as to those omissions.

2.    *Omission of Premier Board Members' Previous Association with David's "Free Energy" Companies*

The SEC next alleges that Defendants failed to disclose "that all of the members of Premier's board were previously associated with David's 'free energy' companies." Mot. at 28. While Defendants do not address this alleged omission in their Opposition or Declarations, the Court nevertheless finds the record evidence insufficient to establish liability on this alleged omission.

The Court makes such a finding because the only undisputed facts on this alleged omission are that: (1) in 2004, Premier Board President Kafes purchased a "dealership" in United Community Services of America Inc., a company of which David was the sole shareholder and executive officer, SEC SUF ¶¶ 21, 141; and (2) Provision/Premier board member Alison David (David's wife) was the administrator of David's "free energy companies, Dutchman Enterprises . . . and Better World," *id.* ¶ 159.

The SEC suggests that there is also no genuine dispute that the remaining Provision/Premier board members, Kafes, Suechting, Rose, and McCoy were "all 'dealers' for David's free energy company 'United Community Services'" according to spreadsheets produced in this litigation. *Id.* ¶¶ 157-58; *see* Mot. at 28. But the Court finds this evidence is not sufficient to establish that "United Community Services" may properly be characterized as a "free energy company." And the SEC has not provided any further support for this characterization. Accordingly, although it very well may be true that characterizing United Community Services as "free energy company" is accurate, viewing the facts in the light most favorable to the non-moving parties (as it must here), the Court finds a genuine dispute as to this fact. This genuine dispute of

32

fact is material (under the summary judgment standard) because Defendants' omission of the Premier board members' involvement in United Community Services could only ever potentially be misleading if United Community Services in fact is a "free energy company" (a fact which would then also have to be material to investors under the securities fraud standard).[29]

Accordingly, the SEC has not proven that Defendants' alleged omission that Premier's board members were all previously associated with David's "free energy" companies is actionable under Section 17(a)(1) and Section 10(b) and Rule 10b–5 thereunder.

### 3. Omission of Letter of Intent with Joachim

The SEC further alleges that Defendants omitted from the Investment Materials any information regarding the Letter of Intent they had sent to Joachim "as a binding pledge" that Joachim would be able to take control of Premier when he was "vindicated," while also representing in those materials that Joachim was simply a consultant or independent advisor to the company. *See* Mot. at 22. The SEC's request for summary judgment on this omission fails not because there is a genuine dispute as to any material fact, but rather because the SEC has not proven the materiality of this omission as a matter of law.

It is undisputed that David and the boards of Provision and ABC Group agreed to draft the Letter of Intent setting up Premier as a replacement for Total Financial's Plan, that this Letter of Intent signed by Kafes was "offered as a binding pledge" to Joachim, and that this replacement company was to be created "under the complete agreement that when [Joachim] [is] vindicated . .

---

[29] And, even if there were no genuine dispute that Premier's board members were all previously associated with David's "free energy" companies, the SEC has not proven that that fact is material (with respect to the securities fraud standard) as a matter of law, given that the SEC relies solely on general case law regarding the importance of management integrity in support of its argument on this omission and does not make any specific arguments as to this specific alleged omission. *See* Mot. at 31-32. That is not enough to establish materiality at summary judgment. *See TSC Indus.*, 426 U.S. at 450.

. then [Joachim] will be able to come into this new company and take it over with full control of the entity as the absolute managing partner." *See supra* Section I.A.  It is similarly undisputed that none of the Investment Materials disclose that the existence of this binding Letter of Intent, much less that it would give Joachim control over Premier when he was vindicated.  *See* Initial Investment Packet, November 2017 Investment Packet; SEC SUF ¶ 470 (quoting May 2018 Informational); June 2018 Informational.

Nor is there any dispute that the Initial Investment Packet and the November 2017 Investment Packet (collectively, the "Investment Packets") represented that Premier had "made a deal with Mr. Joachim to have him assist [Premier] as a consultant" and that Joachim "gets nothing but a small monthly base pay for consulting unless [Premier] do[es] succeed."  SEC SUF ¶¶ 297, 307 (quoting Investment Packets).  The May and June 2018 Informationals also undisputedly contained similar representations that Premier had "hired Denis [Joachim] as an independent advisor (ONLY . . . at least until he is cleared of wrongdoing)" (ellipses in original).  *See id.* ¶ 469 (quoting May 2018 Informational); June 2018 Informational.

But, applying the materiality standard to these undisputed facts, the Court concludes that the SEC has not established that the omission is material as a matter of law.  As with the omission of Premier's board members' association with alleged "free energy" companies, the SEC has not made any specific arguments regarding the materiality of the omission of the Letter of Intent, nor has it adduced any specific case law regarding the materiality of such an omission—relying again solely on the general importance of management integrity and the broad significance to investors of the issue of corporate control and influence.  *See* Mot.  While the Court agrees that a reasonable investor might want to know that the company in which it is investing would change control if the Joachim was vindicated, given the lack of authority on point and the conditionality of the change

of control (and the condition for that change being that Joachim not be convicted on or found liable for any charge), the Court does not find the omission of the Letter of Intent "so obviously important . . . that reasonable minds cannot differ on the question of materiality." *See TSC Indus.*, 426 U.S. at 450.

The Court accordingly need not reach the question of scienter in concluding, as it does, that the SEC has not met its burden with respect to this omission.

### 4.    *Omission of Kafes's Bankruptcy*

The SEC finally alleges that, "while the Informationals described Kafes'[s] background in detail, they failed to disclose that Kafes had declared personal bankruptcy as a result of a lawsuit that executives of Provision's predecessor company brought against that company, Provision, Kafes, and David" and that his bankruptcy proceeding was still pending when each of the Informationals was written and initially distributed.  Mot. at 12.  While there is no genuine dispute of material fact as to this omission, as explained below, the SEC has not adequately proven scienter as to either David or Premier.  The SEC's claims with respect to this omission must therefore fail.

Defendants do not dispute any of the material facts supporting this alleged misstatement: that (1) ABC Group (the company that formed Provision), Provision, David, and Kafes were sued by ABC Group executives on July 1, 2013, SEC SUF ¶ 162; (2) Kafes and his wife filed a voluntary Chapter 13 bankruptcy petition in November 2013, which was prompted in large part by the lawsuit filed against Kafes by the ABC Group executives, *id.* ¶¶ 163-64; (3) Kafes's bankruptcy discharge occurred in late 2018, *id.* ¶ 165; (4) the Informationals all identified Kafes as board president of Provision and acting board president of Premier and described his background in detail, including his service on the boards of multiple privately held companies, *id.* ¶ 395 (citing January 2018 Informational), ¶¶ 466, 471; June 2018 Informational; and (5) that the Informationals did not mention that Kafes had filed for bankruptcy due in large part to the lawsuit filed by the

ABC Group executives, SEC SUF ¶ 407 (citing January 2018 Informational); May 2018 Informational; June 2018 Informational.

While it is likely that Defendants' omission of Kafes's bankruptcy from the Informationals was material in light of their highlighting of the favorable aspects of Kafes's experience in the same, *see, e.g.*, *SEC v. Merch. Cap., LLC*, 483 F.3d 747, 771 (11th Cir. 2007), the Court need not make a materiality determination here because the record before the Court on Defendants' scienter is simply insufficient to support summary judgment on this omission.

The SEC has fatally failed to establish that David knew that Kafes had filed for personal bankruptcy. The SEC has, at best, established that Kafes filed for personal bankruptcy in large part due to a lawsuit in which David was also involved. So, although it appears likely that David was aware of Kafes's bankruptcy filing when he edited and approved the Informationals, a reasonable jury could nevertheless find that David did not know about the bankruptcy and therefore did not knowingly or recklessly make this omission. Because the SEC has not established David's scienter, his scienter cannot be imputed to Premier. And the SEC has not even offered an alternative individual from which the Court could possibly impute scienter to Premier.[30] The Court therefore concludes that the omission of Kafes's bankruptcy filing from the Informationals is not actionable on these facts at this stage of the proceedings.

### B.    Representations Regarding Premier's Banking Relationships

---

[30] In light of the SEC's failure to raise it and given that the Court finds that the SEC is entitled to summary judgment on other grounds, the Court declines to *sua sponte* determine whether it may impute Kafes's scienter to Premier, especially in light of the unsettled contours of the doctrine corporate scienter in this Circuit. *See In re Cognizant Tech. Sols. Corp. Sec. Litig.*, No. 16-6509, 2020 WL 3026564, at *24-32 (D.N.J. June 5, 2020) (explaining that the Third Circuit has not taken a position with respect to this doctrine and describing the narrow, middle, and broad approaches to the doctrine). For the avoidance of doubt, the Court's decision to impute David's scienter regarding his involvement in management and history to Premier above is supported by all three approaches. *See id.*

In addition to its management-related allegations, the SEC alleges that Defendants made numerous false or misleading statements regarding Premier's banking relationships, including statements regarding relationships with specific banks, representations that Premier "ha[s] banks" and "funding in place," and statements concerning "interest" from banks more broadly. Mot. 15-19. The Court finds that all of these bank-related misstatements were in fact false and misleading, material, and made with scienter.

The first alleged misrepresentation is that Defendants stated in the Investment Packets that the CEO of a bank "agreed to loan [Premier's] program 150 million dollars for 10,000 workers in his market area." *Id.* at 15 (quoting SEC SUF ¶¶ 290, 408). Defendants do not dispute that this statement was made in the Investment Packets. Defs. RSUF ¶¶ 290, 408. Nor is there any dispute that the bank referenced in the statement was a large Pennsylvania bank with which Premier did not in fact have $150 million loan agreement because: (1) the Pennsylvania bank had purportedly agreed to loan the money to Total Financial's Plan—not Premier's Plan—in 2016 (prior to Premier's formation),[31] SEC SUF ¶¶ 410-11, and (2) in any event, as David informed the Provision investors in April 2016 (given that, at that time Provision had partnered with Total Financial to find bank partners) the Pennsylvania bank could "no longer do the deal" and that there was "[n]o one to talk to and nothing left to talk about . . . Sorry!" *id.* ¶ 414 (ellipses in original). Considering these undisputed facts, the Court agrees with the SEC that Defendants' statement in the Investment Packets (sent to prospective investors in 2017) that the CEO of a bank had "agreed to loan [Premier's] program 150 million dollars for 10,000 workers in his market area" was false or, at the very least, misleading.

---

[31] David admits that there are "huge differences between the [Total Financial] Classic 105 [Plan] and the Premier 105 [Plan]." Ex. 6 to First Brody Decl. (David's Answer to Complaint).

The second alleged banking-related misstatement is that Defendants represented in the January and May 2018 Informationals that another bank, Minnwest "wants to participate in the plan funding which has them enter into a one-year revolving $150 million loan subject to a third party accepting an amount equal to 8% of the possible shortfall risk (i.e. exposure of $12 million)" and that Defendants made that same statement in the June 2018 Informational but referred to Minnwest this time as a "MN-based bank." Mot. at 16 (quoting SEC SUF ¶ 425 and citing SEC SUF ¶¶ 365, 480). Defendants do not dispute that they made those statements in the Informationals. Defs. RSUF ¶¶ 365, 425, 480. It is also undisputed that: (1) Premier had not entered into any contracts or letters of intent with any bank at the time the Informationals were written or disseminated to investors, much less with Minnwest, SEC SUF ¶¶ 426-28; (2) David never had any conversations with Minnwest relating to Premier—in fact, Minnwest had never heard of Premier prior to this litigation—and his only conversations with Minnwest were on behalf of Total Financial's Plan, *id.* ¶¶ 430-32; (3) David's discussions with Minnwest concluded prior to Premier's formation, after Minnwest told David in 2016 that it would not be the first bank to fund Total Financial's Plan, *id.* ¶¶ 433-36; and (4) Minnwest would not respond to David's phone calls or emails after Premier's formation in 2017, *id.* ¶ 335; Ex. 6 to First Brody Decl. ¶ 81; Ex. 8 to *id.* at 215:4-8. The Court finds that the representations Defendants made in the Informationals, which were created and distributed in 2018, regarding the purported desire of Minnwest/a "MN-based bank" to participate in funding Premier's Plan via loan were, at the very least, misleading considering these undisputed facts—particularly given that David's conversations with Minnwest had ended in 2016 (after which Minnwest would not even respond to his calls or emails) and had involved only Total Financial's Plan (not Premier's).

The third alleged misrepresentation stems from Defendants' statements in the January 2018 and May 2018 Informationals that "[Premier] has banks in various regions to loan over $150 million. . . . With the hardest part done, the funding in place, making the sales is the next and easiest step." Mot. at 17 (quoting SEC SUF ¶ 422 and citing SEC SUF ¶ 365). There is no dispute that Defendants made these statements in those Informationals, Defs. RSUF ¶¶ 365, 422, nor is there any genuine dispute Premier had not entered into any contracts or letters of intent with any bank at the time the Informationals were written or disseminated to investors or that Premier never actually entered into any such contracts or letters of intent at any point in time, SEC SUF ¶¶ 426-428, 529, 549. The only evidence Defendants bring forth in response to the SEC's undisputed facts regarding these statements establishes, at best, simply that David spoke to many banks and received some interest from these banks and that "David never told anyone [Premier] had a bank on contract," *see* Second David Decl at 6, 8, 16, 23-24—which does not contradict these undisputed facts adduced by the SEC. Defendants' evidence therefore does not create a dispute as to the material facts that Defendants represented that Premier "has banks in various regions to loan over $150 million" and "funding in place" without having entered into any contracts or letters of intent with any bank, which the Court concludes rendered this representation in the January and May 2018 Informationals, at least, misleading.

The SEC further alleges that Defendants' statement in the June 2018 Informational that Premier "ha[s] banks in various regions that have shown interest in loaning over $150 million . . . . With the hardest part done, the funding in place, making the sales is the next and easiest step," as well as Defendants' representations in the Informationals that Premier had "all the interested bankers they need" and that the banks were ready or set to go, were false or misleading. Mot. at 16-18 (quoting Informationals). While these are closer calls because a representation that a bank

39

is "interested" or has "shown interest" is less concrete and connotes more uncertainty than the suggestion in the first three statements that the banks had *already agreed* to participate, the Court nevertheless also finds that these representations were misleading because the undisputed evidence before it demonstrates that any interest from banks was interest in *Total Financial's* Plan, not Premier's. David's own lists of calls with banks that "were interested" and "went beyond the first initial call" produced in this litigation do not include any calls made in 2017 and only includes one call in 2018 (made in November 2018, after all the Informationals were created). *See* SUF ¶ 526; Exs. 150 & 151 to First Brody Decl. Even when viewed in the light most favorable to Defendants, the lists therefore show that banks had only expressed interest in *Total Financial's* Plan at the time the Informationals were created (because Premier did not exist at the time David's call with the banks took place). And, although Defendants assert in their unsworn RSUF that "[t]he evidence will prove David had on-going conversations with several banks, but the list provided to Plaintiff was not comprehensive," ¶ 526, "Defendants are required to go beyond the pleadings and by [their] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial," *Chester*, 41 F. Supp. 2d at 516. David's "promise of future evidentiary proof is [therefore] not enough to refute the SEC's evidence of knowing misstatements or to avoid summary judgment. In the oft-cited phrase, this is the 'put up or shut up' moment in this litigation." *SEC v. Cook*, No. 13-1312, 2015 WL 5022152, at *20 n.12 (S.D. Ind. Aug. 24, 2015). Defendants have failed to "put up," as they have not brought forth any competent evidence suggesting that David had calls with interested banks after Premier's formation or that banks expressed interest in another ways. The undisputed fact that any interest banks expressed was in Total Financial's Plan rather than Premier's Plan accordingly necessarily renders these statements misleading.

The Court also finds that the bank-related representations outlined above were material as well as misleading. Premier's relationships with banks were critical to Premier's business because, as Defendants explained in the Informationals themselves, the Premier Plan "requires extensive working capital, since it is necessary to fund a $15,900 loan for each employee within a sponsoring employer" to cover employees' out-of-pocket healthcare costs under the Plan. *See* SEC SUF ¶ 415 (quoting January 2018 Informational), ¶ 365; June 2018 Informational. Consistent with the Informationals, David admitted in his Answer to the Complaint that banks were "one thing [Premier] needed for the success of the project" (among others) and that "banks [being] on the dotted line and [their] money . . . transferred" was one of the things "critical to [Premier's] success." Ex. 6 to First Brody Decl. at 71-72. And Premier CEO Lipkus testified that that "Premier seeking banking relationships" was "a key component" of Premier's Plan, to such an extent that "[i]f there no banking, there was no program" and the Plan would "fall[] apart" without the "cash flow" provided by the banks. Ex. 106 to First Brody Decl. at 40:20-42:5.[32]

Given the undisputed importance of the bank loans and relationships to Premier's business, the Court finds that Premier's representations that the Pennsylvania bank had "agreed" to loan Premier money, that Minnwest "wants to participate" in funding the Premier Plan through loans, that Premier "has banks" and "funding in place," and that Premier had "all the interested banks they need" would, in turn, be so obviously important to the reasonable investor that the question of materiality need not go to a jury. *See, e.g.*, *SEC v. Sethi Petroleum, LLC*, 229 F. Supp. 3d 524, 540 (E.D. Tex. 2017), *aff'd sub nom. SEC v. Sethi*, 910 F.3d 198 (5th Cir. 2018), *cert. denied*, 140

---

[32] Premier investors have also provided affidavits averring that they "would not have invested" in Premier had they "known that Premier . . . did not have bank funding," SEC SUF ¶¶ 588-89 (quoting Exs. 190 & 191 to First Brody Decl.), further evincing the materiality of these bank-related misrepresentations.

S.Ct. 95 (holding that defendant's characterization of oil company's partnerships with other oil and gas companies would lead investors to incorrectly believe that relationships were "currently existing" and that those mischaracterizations were sufficiently material to grant summary judgment to SEC); *SEC v. E-Smart Techs., Inc.*, 74 F. Supp. 3d 306, 312, 317-20 (D.D.C. 2014) (finding that statements that company "had just obtained, or was about to obtain, significant contracts and investments" were material such that summary judgment for the SEC was warranted); *SEC v. Poirier*, 140 F. Supp. 2d 1033, 1043 (D. Ariz. 2001) (press releases that "falsely claimed business contracts that were not in place" were materially misleading such that summary judgment was appropriate).[33]

The Court also finds that Defendants made the misrepresentations described above with the requisite scienter. By the time David wrote and put together the Investment Packets in 2017, the Pennsylvania bank had informed David directly that it "could no longer do the deal," SEC SUF ¶¶ 375, 414, and David was also aware that the Pennsylvania bank had purportedly agreed to loan the money to Total Financial's Plan—not Premier's, SEC SUF ¶¶ 410-11, demonstrating that

---

[33] *See also, e.g., SEC v. All. Transcription Servs., Inc.*, No. 08-1464, 2009 WL 5128565, at *4-5 (D. Ariz. Dec. 18, 2009) (granting summary judgment for SEC after finding that statements "containing false or misleading information regarding [company's] contracts, revenue, and relationship with other companies" were material); *In re Salomon Analyst Metromedia*, 236 F.R.D. 208, 210, 222-23 (S.D.N.Y. 2006), *vacated and remanded on other grounds*, 544 F.3d 474 (2d Cir. 2008) (holding that plaintiffs had adequately shown that misrepresentations regarding a credit facility that would fund company's business plan were material); *SEC v. Glob. Telecom Servs., L.L.C.*, 325 F. Supp. 2d 94, 112 (D. Conn. 2004) ("False representations that . . . "[defendant] had contracts with companies . . . are material [at summary judgment stage], as a reasonable investor would consider these representations as important facts in determining whether to invest."); *SEC v. Presto Telecommunications, Inc.*, 237 F. App'x 198, 199-200 (9th Cir. 2007) (affirming grant of summary judgment to SEC where defendant had made "numerous material misrepresentations to investors concerning [telecommunications company's] relationships" with other telecommunications companies"); *SEC v. U.S. Sustainable Energy Corp.*, No. 08-245, 2011 WL 2980549, at *8 (S.D. Miss. July 21, 2011) (granting summary judgment to the SEC because false statements regarding, *inter alia*, "the engagement of prominent investment banker . . . continued to keep investors interested in purchasing . . . shares").

David knew that his representation that the CEO of a bank (which David admits was the Pennsylvania bank) had "agreed to loan [Premier's] program 150 million dollars for 10,000 workers in his market area" was false when he made it, or, at minimum, that he was reckless as to the obvious danger that the representation would mislead investors. *See Sethi*, 229 F. Supp. 3d at 540 (misrepresentation made with scienter where the SEC had established Defendant had acted recklessly because the misrepresentation "would obviously create a danger of misleading investors"). David similarly knew that his conversations with Minnwest had ended in 2016 (after which Minnwest would not even respond to his calls or emails) and had involved only Total Financial's Plan (not Premier's), *id.* ¶¶ 335, 430-36, when he provided the information for, significantly edited, and approved the 2018 Informationals containing the representation that Minnwest/a "MN-based bank" "wants to participate in the plan funding which has them enter into a one-year revolving $150 million loan," such that either he knew it was false or misleading or was reckless as to the obvious danger that it would be. *See Poirier*, 140 F. Supp. 2d (SEC had proven scienter at summary judgment where defendant knew that contracts did not exist but stated that they did in press releases). In the same vein, David made the statement in the June 2018 Informational that Premier "ha[s] banks in various regions that have shown interest in loaning over $150 million . . . . . With the hardest part done, the funding in place, making the sales is the next and easiest step," as well as the representations in the Informationals that Premier had "all the interested bankers they need" and that the banks were ready or set to go knowing or recklessly disregarding the obvious danger that the statements were false or misleading because the undisputed facts show that he had only had conversations with banks regarding Total Financial's Plan at the time he made those statements. David further made the representation in the Informationals in 2018 that Premier "has banks in various regions to loan over $150 million" and

"funding in place" knowing that Premier had not entered into any contracts or letters of intent with any bank at the time, SEC SUF ¶¶ 426-428, 529, 549.  Again, at minimum, this presented a danger of misleading investors that is so obvious that that David must have been aware of it.  *See E-Smart*, 74 F. Supp. 3d at 321 (defendant "acted with the requisite mental state to establish liability" at summary judgment where it was "not possible to believe that . . . CEO did not know" the undisputed facts rendering the CEO's representation false or misleading).   Moreover, and for the reasons outlined in Section III.A.1, *supra*, the Court imputes David's scienter to Premier.

The SEC has accordingly established liability as to the material misrepresentations that the Pennsylvania bank had "agreed" to loan Premier money, Minnwest "wants to participate" in funding the Premier Plan through loans, Premier "has banks" and "funding in place, Premier "ha[s] banks in various regions that have shown interest in loaning over $150 million," and Premier has all the interested bankers they need" and that the banks were ready or set to go.

## C.    Representations Regarding Premier's Patents

The SEC next alleges that Defendants made further misrepresentations in the Investment Materials concerning Premier's patents.  Mot. at 12-15.  The Court first finds that Defendants' (1) representations that Premier's "program design" was "patent protected" and that its business "holds significant intellectual property" in the January 2018 Informational and (2) representations in the Investment Packets and June 2018 Informationals that Premier had patents pending were false or misleading, and, in turn, concludes that no reasonable jury would find for Defendants on any the elements of the SEC's claims with respect to those misrepresentations.

The undisputed facts establish that David personally applied for patent protection for an invention he called a "self-liquidating loan for banks" (the "Bank Loan Process Patent") in 2014, SEC SUF ¶¶ 444-45, three years before Premier was formed.[34]

Then, in 2017, Defendants represented in the Investment Packets that the "bank process concept . . . is patent pending."  *Id.* ¶ 289 (quoting Initial Investment Packet), ¶ 308 (November 2017 Investment Packet).

In the first few pages of the January 2018 Informational, Defendants state twice that "[t]his business holds significant intellectual property."  January 2018 Informational at 3-4; SEC SUF ¶ 439.  This Informational also represents that "their [Premier's] competitive advantage is their innovative program design which is patent protected."  SEC SUF ¶ 440 (quoting January 2018 Informational).

The United States Patent and Trademark Office (the "USPTO") preliminarily rejected David's application for the Bank Loan Process Patent" and issued a final rejection in March 2019, and then the Patent Trial and Appeal Board denied his appeal in December 2020, after which, in March 2021, the USPTO determined that the patent application had been abandoned.  *Id.* ¶¶ 505-09.  David also tried to revive this patent application after this filing of this action, but it was once again deemed abandoned by the USPTO in December 2023.  Ex. 167 to First Brody Decl.  David personally filed for a second patent titled "No Cost Value Added Healthcare and Retirement for Existing 125 Group Plans to Restore the USA FICA Program for all working Americans" in March 2018 (the "Second Patent"), which was preliminarily rejected in December 2020.  SEC SUF ¶¶ 517-19.

---

[34] David and Joachim are the listed investors.  *Id.* ¶ 446 (citing Ex. 154 to First Brody Decl.).

In the June 2018 Informational (created after the filing of David's Second Patent) Defendants represented that Premier's "innovative program design" was "pending patent protection," *id.* ¶ 475 (quoting June 2018 Informational), and Defendants continued to use the June 2018 Informational to solicit investors even after the USPTO had issued a final rejection to David's Bank Loan Process Patent application in March 2019, *id.* ¶ 389; *see supra* n.13.

The Court agrees with the SEC that each of the aforementioned patent-related representations was, at the very least, misleading. It is undisputed that Premier never filed any patent applications in its own name. SEC SUF ¶ 443; Exs. 153 & 172 to First Brody Decl. Defendants also concede that David submitted his patent applications personally and that Premier failed to disclose in the Investment Packets and January 2018 Informational that the Bank Loan Process Patent was owned by David personally and not Premier. *See* SEC SUF ¶¶ 449, 518. Moreover, in February 2018, David asked Joachim to sign, and confirmed receipt of, a statement providing, *inter alia*, that "all of the decisions about the use of the patent and preparation of the patent shall be made by *Josiah David personally*." Ex. 95 to First Brody Decl. (emphasis added). And David continued to maintain that he was the owner of the patents in documents contemporaneously created after the final Informational was written, telling Lanza and Lipkus, "Both patents are my patents that I purchased that I will allow Provision and Premier to use," and further noting, "I am patenting this personally." Ex. 99 to *id.* Even viewed in the light most favorable to Defendants their assertions in the First David Declaration that "Premier owns all of the patent rights for the three patent applications prepared by David and his attorney[35] as well as

---

[35] The Court also notes that there is no genuine dispute that David only filed two separate patent applications. *Compare* Ex. 172 to First Brody Decl. (Defendants' amended response to interrogatory stating, "An examination of the facts with the patent attorney for the Defendants reveals that he never filed a third application for patent[.] Since we have already identified the first

the three patents owned by [Total Financial]," First David Decl. ¶ 7, and in the Kafes Declaration that "Premier states that the Premier Board and David have a mutual understanding that David is the filer of the patent applications via his attorney, but Premier as the acquirer of intellectual property, owns the right to the intellectual property set forth in the patent applications," ¶ 8, the Court finds that there is no genuine dispute as to the fact that David, not Premier, owned the patents *at the time the Investment Packets and Informationals were created and disseminated* because Defendants have not brought forth any information regarding any patents owned by Total Financial (or established their relevance) nor have they indicated when Premier purportedly obtained ownership of these patent rights.[36]  Without facts specifically disputing that David, not Premier, owned the patents at the time when Investment Packets and Informationals were created and disseminated, the Defendants have failed to raise a genuine issue of material fact.  *See Strategic Glob.*, 262 F. Supp. 3d at 1019 (explaining that "[t]o be material, any evidence of [a fact bearing on the legality of a business] must be tied to the period when [the company] issued the press releases" asserting the legality of the business, so defendants "fail[ed] to defeat [p]laintiff's motion for summary judgment because [d]efendants ha[d] failed to put forth any evidence tying . . . [that] claimed [fact] to the time that the subject press releases issued."); *see also Drexel v. Union Prescription Centers, Inc.*, 582 F.2d 781, 789-90 (3d Cir. 1978) ("Although affidavits . . . submitted by [party] . . . are consistent with its assertion that it did not retain control over its

---

two applications for patents, we withdraw our response that there was a third") *with* Ex. 153 to *id.* (Defendant's initial response to same interrogatory).

[36] Defendants also vaguely claim in their unsworn RSUF that "Premier's agreements transferred his rights to Premier," ¶ 450, but, again, fail to provide a date for this supposed transfer or any further information about it.  The Court also agrees with the SEC that any purported transfer would not create a genuine issue of material of fact because the rights to a patent application can only be validly assigned in writing, *Feuss v. Enica Eng'g, PLLC*, No. 20-02034, 2022 WL 4377236, at *4 (D.N.J. Sept. 22, 2022), which Defendants admit they did not do, Defs. RSUF ¶ 461.

franchisee's manner of operation, they are, as the district judge acknowledged, 'essentially conclusory' and lacking in specific facts, and of little assistance in reflecting the meaning of the control provisions of the Agreement" at summary judgment); *SEC v. Rsch. Automation Corp.*, 585 F.2d 31, 34 (2d Cir. 1978) (affirming district court's finding in securities fraud case that "[d]efendant's affidavit had totally failed to contradict (the charges) with any specificity and . . . determination that there was no need for a trial"). The SEC has accordingly sufficiently demonstrated that Defendants' representations regarding Premier's patents were at least misleading because they obfuscated who truly owned (or had applied for) the patents at the time of the creation and initial dissemination of each of the Investment Materials.[37] *See Sustainable Energy*, 2011 WL 2980549, at *13 ("[I]n fact, [company's] "patent pending" claims were false. [The company] never owned any patent pending technology. [Company's founder], not [company], filed and owned the provisional patents [company] claimed to hold."). And Defendants' failure to update the June 2018 Informational to disclose that David's Bank Loan Process Patent application had been rejected by March 2019 further rendered the statement in the June 2018 Informational that Premier's program design was "patent pending" misleading. SEC SUF ¶¶ 389, 505-09.[38]

The Court next finds that these misrepresentations were material. A review of the statements in the Investment Materials surrounding the misrepresentations demonstrates the

---

[37] Moreover, the statement in the January 2018 Informational that Premier's "program design" was "patent protected" was made even more misleading by the fact that neither David nor Premier had successfully obtained a patent at the time the January 2018 Informational was created and disseminated. *See* SEC SUF ¶¶ 505-09; Exs. 153 & 172 to First Brody Decl.

[38] David learned of the USPTO's final rejection of the Bank Loan Process Patent by September 4, 2019, at the very latest, when he appealed the rejection. *Id.* ¶ 507 (citing Ex. 165 to First Brody Decl.). Defendants, however, continued to use the June 2018 Informational until March 2021. *Id.* ¶ 389; *see supra* n.13.

importance of the patents to Premier's business. The January 2018 Informational, for instance, described the "innovative program design which is patent protected" as a "strategic competitive advantage" and explained that the protection "creates a barrier or wall making it very difficult for any competitor to penetrate [Premier's] market." SEC SUF ¶¶ 440-41. The Informational's touting of the patents as "a strategic competitive advantage" therefore "implicitly acknowledge[s] the significance" of the patents. *See Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 165 (2d Cir. 2000).

Defendants also explicitly acknowledge the significance of the patents. In his Declaration, for instance, Premier Board President Kafes states that the "intellectual property" and "patent application information . . . is valuable." Kafes Decl. ¶ 12. The deposition testimony of Premier EVP Lanza further demonstrates the importance of the patents, and particularly the importance of the ownership of the patents. Lanza testified that "[o]f course" "ownership of the patent[s]" was "important to value Premier" because "the patent owners had all the profit" and that patent ownership was also "important for the company's financial statements and the company," so much so that the company "can go bankrupt if it doesn't have that [ownership of the patents]." Ex. 102 to First Brody Decl. at 106:19-107:4. Lanza also testified that ownership of a patent is "very important" because "investors want to [know] who owns the patent because that's the whole program." *Id.* at 103:5-17. The Court agrees with Lanza, and extends his observation to hold that "whether [Defendants] had patents is a matter of material interest to a potential investor." *SEC v. Inteligentry, Ltd.*, No. 13-00344, 2015 WL 1470498, at *20 (D. Nev. Mar. 31, 2015), *aff'd*, 749 F. App'x 661 (9th Cir. 2019) (summary judgment was appropriate on materiality grounds where defendant's website stated, *inter alia*, "We OWN Patent(s) and have pending patent(s)" when defendants did not own or having pending patents at the time); *see also Sustainable Energy*, 2011

WL 2980549, at *5, *13-15 (misrepresentations that company "had patented technology" and "owned patent pending technology" when company did not own technology at issue were among "material misrepresented facts establish[ing] a violation of Section 10(b) of the Exchange Act and Rule 10b–5 thereunder" at summary judgment); *SEC v. Laura*, 680 F. Supp. 3d 204, 227 (E.D.N.Y. 2023) ("The fact that the . . . [c]ompanies did not own the technology . . . to the technology significantly alters the total mix of available information . . . [and are] so obviously important to an investor that they are material misrepresentations as a matter of law.").  Setting aside the importance of knowing *who* owned the patents, Lanza further testified that "decisions of the [USPTO] relating to . . . David's patent applications" would "of course" "have been important for [him] to know as an investor in Premier" given that "[t]he whole business is based on that."  *Id.* at 122:7-17.[39]  As the Second Circuit explained in affirming a district's court grant of summary judgment to the SEC based on patent-related misrepresentations, "Who could not regard as vital the denial of U.S. patent protection for [defendant's] principal product . . . ?"  *Rsch. Automation*, 585 F.2d at 35.  This Court finds, that as to the facts in this case, the answer is no reasonable investor.  Accordingly, and because of the previously established importance of the identity of a

---

[39] Lanza also testified that had "[h]ad [he] he known" that "the patents were in . . . David's name and not in [Premier's] name and that there was no agreement between . . . David and the company to . . . give exclusive rights to [the company] to use those patents" "he would not have invested there and would have not worked there."  *Id.* at 169:5-15.  Several other Premier investors have similarly stated in affidavits that they were not aware that the patent applications were filed in David's name and that if they had known that the patents, if granted, would not have been in Premier's name, they would not have invested.  *See* SEC SUF ¶¶ 594-95 (citing Exs. 190 & 191 to First Brody Decl.).  Lanza also informed David on June 1, 2018, that "who . . . Premier use[d] as legal representation for the patent . . . [was] a large investor question," further cementing  SEC SUF ¶ 453 (quoting Ex. 155 to First Brody Decl.).

patent applicant/holder, these patent-related misrepresentations are so obviously important to an investor that the question of materiality need not go to a jury.[40]

Moreover, Defendants made these material misrepresentations with scienter. There is no doubt that David knew that he—not Premier—had applied for the Bank Loan Process Patent[41] when the Investment Packets stating that Premier's "bank process concept . . . is patent pending" were sent out to investors in late 2017 and the January 2018 Informational representing that Premier's "competitive advantage is their innovative program design which is patent protected" was sent out, since he told the Provision board (before Premier's formation) that he "personally owns the bank funding patent process as the primary patent holder, and Denis Joachim is the junior holder (he paid nothing for it), as a courtesy." Ex. 88 to First Brody Decl. at 2. And in February 2018, before the creation of the June 2018 Informational, wherein Defendants represented that Premier's "innovative program design" was "pending patent protection," David had Joachim sign and mail to David the following statement, which David also signed on February 26, 2018, upon receiving Joachim's signed copy of the statement:

---

[40] The Court agrees with the SEC that Defendants' argument that "there is no evidence that any investors requested information about patents or that patents were material to their decision to invest in the project until they were questioned by the [SEC]," Opp. at 7, is "incorrect," but also "of no consequence," Reply at 9, given the Court's finding that the misrepresentations are material as a matter of law. Courts across the country have similarly found other patent-related misrepresentations material as a matter of law. *See, e.g.*, *Flaxel v. Johnson*, 541 F. Supp. 2d 1127, 1138 (S.D. Cal. 2008) (finding that "reasonable minds cannot differ on the question of the materiality of" misrepresentation that company "possessed patented technology, when nothing more than provisional patent applications and disclosure statements had been filed" and granting summary judgment for plaintiff on federal securities fraud claims); *Glob. Telecom*, 325 F. Supp. 2d at 112 (misrepresentation that company "owned the patent rights" was material such that summary judgment was warranted); *SEC v. C3 Int'l, Inc.*, No. 21-01586, 2022 WL 16814859, at *5 (C.D. Cal. Nov. 7, 2022) (holding that representation that company "had a patent (or a pending one) for [product] when only an application for a provisional patent had been filed" was material and granting summary judgment for the SEC).
[41] The patent application for the Second Patent was not filed until March 2018. SEC SUF ¶¶ 517-19.

> Josiah David personally paid for the patent protection on the self-liquidating bank loan process for the Provision Bank Loan Program. As a courtesy, Josiah David put myself, Denis Joachim, down as a partner in the application, but that is as a junior partner. Josiah David paid for the patent application and will pay all costs for the patent, with none of those costs falling on the junior partner. As the junior partner, I fully understand and agree, that *all of the decisions about the use of the patent and preparation of the patent shall be made by Josiah David personally*, without his needing to confer with me as the junior partner before making any decision. The concept of the bank loan relates to a design of Josiah David's origination.

Ex. 95 at *id.* (emphasis added). And, after David had also filed the Second Patent, which David again knew only he had personally filed, SEC SUF ¶¶ 517-18, David and Premier represented in the June 2018 Informational that Premier's "innovative program design" was "pending patent protection." David's knowledge that he, not Premier, was the true patent applicant is further evidenced by his statement to the USPTO in November 2019 "[t]he real party in interest [for the Bank Loan Process Patent] is Josiah David." *Id.* ¶ 508 (quoting Ex. 165 to First Brody Decl.). That David knew that each of the patent-related representations in the Investment Materials were false or misleading when he made them—because he knew that he, not Premier had filed the patents—is sufficient to establish scienter here. *See, e.g.*, *Sustainable Energy*, 2011 WL 2980549, at *7 (finding that defendant made false statements that company had "patented technology" with scienter where defendant had applied for patents personally and then "signed a memorandum of understanding . . . that falsely claimed [the company] had patented technology"); *Flaxel*, 541 F. Supp. 2d at 1138 (holding that statements such as "claiming to have nonexistent patents" were made with scienter because they "presented a danger of misleading the moving plaintiffs that defendants either knew or should have been aware of").[42]

---

[42] David also knew that neither he nor Premier had successfully obtained a patent at the time the January 2018 Informational was created and disseminated, and thus that the statement in the January 2018 Informational that Premier's "program design" was "patent protected" was not true.

But the evidence of scienter with respect to these patent-related misrepresentations goes beyond David's knowledge of their falsity. When David was asked at deposition whether he told any prospective investors (besides Premier's board) that he "owned the patent applications personally and not the company," he answered, "Obviously not." Ex. 8 to First Brody Decl. at 524:13-16. And on June 20, 2018, after the creation of the last Informational, David wrote to EVP Lanza and CEO Lipkus via email, "[b]oth patents are my patents that I purchased that I will allow Provision and Premier to use. . . . *Do not tell anyone that I am patenting this personally*." SEC SUF ¶ 455 (quoting Ex. 99 to First Brody Decl.) (emphasis added). "[T]hat a person takes certain steps to cover up a misdeed is certainly . . . evidence that the person knew he had made a mistake[,] . . . which support a finding of conscious or reckless behavior on the part of [Defendants]." *SEC v. Lucent Techs., Inc.*, 363 F. Supp. 2d 708, 717 (D.N.J. 2005) (defendant's "actions and . . . letters . . . [could] give rise to the inference that [defendant] did not want . . . accountant to know of the oral side agreement he had authorized his subordinates to enter into"). In conjunction with the other undisputed facts, this evidence that David wanted to conceal his "personal[]" ownership of the patents establishes that demonstrates that David knew that he, rather than Premier, owned the patent applications, and therefore that David acted with scienter. And, once again, David's scienter is properly imputed to Premier. *See supra* Section III.A.1.

Having determined that no reasonable jury could find that the patent-related misrepresentations described above were not false or misleading, material, and made with scienter, the Court holds that the SEC has established liability as to those representations.

---

*See* SEC SUF ¶¶ 505-09; Exs. 153 & 172 to First Brody Decl. David was similarly aware of the USPTO's final rejection of the Bank Loan Process Patent by September 4, 2019, at the very latest, when he appealed the rejection, SEC SUF ¶ 507 (citing Ex. 165 to First Brody Decl.), and nevertheless failed to update the June 2018 Informational to disclose that the Bank Loan Process Patent was no longer pending.

D.        **Representations Regarding Legal Opinion Letters**

Rounding out the topics about which Defendants allegedly made false or misleading statements, the SEC alleges that Defendants made misleading statements to prospective investors concerning legal opinion letters purportedly attesting to the legality of Premier's Plan. Mot. at 19-21. The Court finds that each of the opinion letter-related representations are actionable under Section 10(b) and Rule 10b-5 thereunder and Section 17(a).

The SEC's first set of alleged misrepresentations is that Defendants stated in the Initial Investment Packet, "We KNOW the plan is legal and proper and complies with all the regulations and IRS codes. There are legal opinions from experts" and also provided selected quotations from the letter "to assure you [potential investors] that these letters are real." Initial Investment Packet; SEC SUF ¶¶ 292, 294.

The SEC next alleges that, in each of the Informationals, Defendants represented that: (1) "[t]his plan is supported by legal opinions of compliance with governmental regulations, ERISA standards, and the Affordable Care Act," (2) "[t]he Premier 105 plan is supported by legal opinions of compliance," (3) Premier has "legal opinions and other documents to support legitimacy," (4) "[w]e can present to the business, all the favorable legal opinion letters," and (5) "[a]t every junction, another legal opinion letter that was added that demonstrated more sound reasoning in some major factor in the program design." SEC SUF ¶ 462 (quoting January 2018 Informational at 4, 6, 7, 38, 47), ¶ 484 (quoting June 2018 Informational at 4-6, 35, 46); ¶ 365.

The SEC finally alleges that Defendants also stated in the May and June 2018 Informationals, in the middle of a paragraph regarding Total Financial's Plan and Premier's formation, "[w]e knew there was nothing wrong with the program. It had 3 legal opinions from experts." *Id.* ¶ 467 (quoting May 2018 Informational at 19); ¶ 484 (quoting June 2018 Informational at 18).

The Court concurs that these opinion letter-related representations were misleading. *First*, as the SEC argues, the undisputed evidence evinces that two of the three legal opinion letters Defendants referenced in the Investment Materials had effectively been withdrawn by the time Defendants made these statements. David learned that the first legal opinion ("First Opinion Letter") had been effectively withdrawn in 2015 (before Premier's formation), when the attorney who had written that letter told Minnwest (one of the banks about which Defendants made banking-related misrepresentations) that "there [was] an old opinion that may be floating around that he had given to [Total Financial] years ago but that the *opinion is out of date and should not be relied upon*," and Minnwest relayed that information to David via email. *Id.* ¶ 244 (quoting Ex. 115 to First Brody Decl.) (emphasis added). David subsequently informed the Provision board that the attorney had made that statement. *Id.* ¶ 245. But Defendants did not disclose in any of the Investment Materials that the first letter "should not be relied upon." And the author of the second legal opinion letter quoted and referenced in the Investment Materials—which was initially written in October 2012 (the "Second Opinion Letter")—wrote a superseding letter in January 2017 (again, before Premier's formation), stating, "This letter serves to replace any prior letters and opinions due to the discovery of additional facts. . . . You should no longer reply on any previous letters or opinions you have received from us. . . . [I]t is our opinion that the 'Classic 105' is not compliant with ERISA § 406 nor Internal Revenue Code § 4975." *Id.* ¶¶ 248-50 (quoting Ex. 94 to First Brody Decl.) (the "Superseding Letter"). While the Defendants did disclose this Superseding Letter in the November 2017 Investment Packet, they did not do so in the Initial Investment Packet, even though they had already received the Superseded Letter, and instead quoted the superseded Second Opinion Letter without further explanation. *See* Initial Investment Packet. The Court accordingly finds that it was misleading for the Defendants to: (1) repeatedly

reference "legal opinions" they had obtained in each of the Informationals, when they knew two out of the three legal opinion letters had been effectively withdrawn, (2) state in the May and June 2018 Informationals, "[w]e knew there was nothing wrong with the program[;] [i]t had 3 legal opinions from experts," when the authors of two of those three letters had already made clear they should no longer be relied upon, and (3) reference and quote in the Initial Investment Packet the Second Opinion Letter that had been superseded, as well as the First Opinion Letter Defendants knew could no longer be relied upon.[43]

The Court finds that, *second*, it was further misleading for Defendants to continue to use the June 2018 Informational and its repeated references to legal opinions, when the First Opinion Letter had long since been rescinded and the author of the Second Opinion Letter (who had already drafted the Superseding Letter) had since drafted a new opinion letter—this time specifically for Premier—in July 2018. *See* SEC SUF ¶¶ 254-61. The letter explained, *inter alia*, that the author "specifically ha[d] concerns regarding the loan arrangement and use of forfeited funds under the Plan" and stated that "the Plan's optional loan provision more likely than not does not constitute a legitimate loan." *Id.* ¶¶ 256-57 (quoting Ex. 118 to First Brody Decl. ("July 2018 Letter")).

---

[43] Kafes's assertion in his Declaration that "[s]ubsequent letters and other communications by the authors of the letters which disavowed their advocacy, upon close inspection, did not claim that the original unadulterated design of the Classic 105 was not in conformity with the laws and regulators[;] [r]ather the authors of the letters either discovered that in practice by Joachim and Total Financial, the design was not being adhered to or implemented as it was described to them, or the authors were receiving an inordinate number of inquiries without compensation about the letters they wrote, thereby causing them to no longer be willing to support their original opinions," ¶ 15, does not create a genuine dispute as to the fact that Defendants did not disclose the recission of the letters. Kafes doesn't cite any evidence to support these assertions, but, even if he did, the Court concludes that it was misleading for to Defendants to continue to reference these rescinded letters in the Investment Materials (without disclosing that they had been rescinded) regardless of the reason for their recission. Defendants' argument in their Opposition that the letters were withdrawn "due to the . . . intervention" of the SEC, Opp. at 7, fails for the same reason (and is directly contradicted by the undisputed facts that the letters were withdrawn in 2015 and 2017, long before the SEC filed this action).

Premier was never able to obtain a legal opinion letter supporting the legality of the loan aspect of its Plan. *Id.* ¶ 568. The only favorable legal opinion letter Premier was able to obtain in its own name did not address the loan aspect because the firm providing the letter "did not want anything to do with giving an opinion about the loan program." *Id.* ¶¶ 555-56, 561, 564 (quoting Ex. 100 to First Brody Decl.). And this letter specifically prohibited Premier from using the letter "to market the program or otherwise share[] with Premier's clients or prospective clients." *Id.* ¶ 560 (quoting Ex. 184 to First Brody Decl. ("October 2019 Letter")). That the July 2018 Letter expressed concerns regarding the (critical) loan portion of the Plan and the October 2019 Letter declined to address the same (and prohibited the letter's use in marketing) therefore rendered Defendants' continued use of the June 2018 Informational further misleading.[44]

These legal opinion-related misrepresentations in the Investment Materials were material as well as misleading, as evidenced by Defendants' own actions. In March 2019, for instance, David explained to Premier's existing investors the need for a new opinion letter, stating, "we live in a society that is all about endorsements and refuses to think for itself. . . . [and] investors we

---

[44] The Court also holds that David's conversations with prospective investors, *see* First David Decl. at 2-3; Opp. at 6, do not create a genuine dispute of material fact as to whether any of the statements made in the Investment Materials at issue in this Motion were false or misleading. Even assuming that David "answered all questions presented" by investors, Opp. at 6, the Court concurs with the SEC that David does so does not mean that he answered those questions truthfully or disclosed all relevant material facts. *See* Reply at 5-6. In fact, the undisputed facts establish that from 2017 through 2019, David did not disclose to any prospective investor that his name was Dennis Lee or that he had a criminal or regulatory history. SEC SUF ¶¶ 274-75. And the SEC is also correct that none of the various "disclaimers" in the Informationals are sufficient to preclude liability here. *See* Reply at 15. The "disclaimers" David highlights in his First Declaration do not concern any of the subjects of the misrepresentations established *supra*. These "disclaimers" irrelevant to Premier's management, banking relationships, patents, and legal opinion letters accordingly do not foreclose liability as they "do[] not even begin either to specify any of the material omissions . . . , or to correct misrepresentations . . . [and] certainly did not correct the individual misstatements." *SEC v. Galaxy Foods, Inc.*, 417 F. Supp. 1225, 1247-48 (E.D.N.Y. 1976), *aff'd*, 556 F.2d 559 (2d Cir. 1977).

encountered did not share our sentiments about the value of our [existing] Opinion letters" and that "there are some companies that will need [a new opinion letter] to go forward and some of the banks may need it."  SEC SUF ¶ 551 (quoting Ex. 181 to First Brody Decl.).  And, later in 2019, David explicitly tied the chance of raising more money from investors to obtaining a positive opinion letter (thereby demonstrating the importance of such letters), writing to Joachim in an email:

> We are in a position that if we cannot find a way to rectify the issues broached and get a favorable Opinion Letter, we may not be able to continue.  Banks and investors, to cover our overhead to start, all need a "top 100" Opinion.  We NEED a positive Opinion Letter to go forward . . .  And, we do not have endless resources.  I have had to raise every penny that has come in to the company, and at this point in time, without a positive Opinion Letter, there is really not much chance of raising any more.

*Id.* ¶ 553 (quoting Ex. 182 to First Brody Decl.).  The actions of investors and bank partners at the time Premier was raising money further confirm the importance of these legal opinions.  Minnwest, for instance, contacted the author of the First Opinion Letter in 2015 to learn more about it and verify its accuracy, *id.* ¶ 244 (quoting Ex. 115 to First Brody Decl.), and a prospective investor in Premier required in November 2018, as a condition precedent to closing on a $4 million loan and/or private placement of equity, "a Legal Opinion from a Ranked 100 U.S. Law Firm on the program structure, the plan's compliance with governmental regulations, ERISA standards, and the Affordable Care Act," *id.* ¶ 608 (quoting Ex. 193 to First Brody Decl.).[45]  The Court therefore finds that Defendants' representations regarding the legal opinion letters were "so obviously important . . . that reasonable minds cannot differ on the question of materiality," *see TSC Indus.*,

---

[45] The SEC has also submitted affidavits from Premier investors explaining that they had not been told that two of the three authors of the legal opinion letters had withdrawn them, and that, if they had been told that, they would not have invested in Premier.  *Id.* ¶¶ 605-06 (quoting Exs. 190 & 191 to First Brody Decl.).

426 U.S. at 450.  *See, e.g.*, *In re Access Cardiosystems, Inc.*, 776 F.3d 30, 34-35 (1st Cir. 2015) (affirming bankruptcy court's determination that "affirmatively representing that patent counsel 'has reviewed and preliminarily passed muster on the patent soundness of the intellectual property' significantly alters the total mix of information about the proposed investment's risk"); *SEC v. Profile Sols., Inc.*, 727 F. Supp. 3d 1301, 1316 (S.D. Fla. 2024) (granting summary judgment for SEC where representations regarding the legality of company were misleading and material because issue of legality was "critical"); *Strategic Glob.*, 262 F. Supp. 3d at 1018-25 (finding that defendants had "made material misstatements and omissions regarding [company's] legal ability to operate" its business such that summary judgment for the SEC was appropriate because its inability to legally operate "would have been viewed by the reasonable investor as having significantly altered the total mix of information").

Defendants made these legal opinion letter-related material misrepresentations with scienter.  As outlined *supra*, David knew that the First and the Second Opinion Letters had been effectively withdrawn when the Initial Investment Packet stated, "we KNOW the plan is legal and proper and complies with all the regulations and IRS codes[;] [t]here are legal opinions from experts" and quoted both of those opinion letters,[46]  and when each of the Informationals repeatedly referenced legal opinions (with the May and June 2018 Informationals also more specifically referencing the "3 legal opinions).  In the Initial Investment Packet, David even discouraged prospective investors from contacting the authors of the opinion letters, writing, "[to] call these professionals to find out if they meant what they wrote is ridiculous," and, "They do not have to be contacted to see if they really meant what they wrote.  They signed it.  They meant it."  Initial

---

[46] In fact, David discussed the recission of both the First and Second Opinion Letters at Provision and/or Premier board meetings.  SEC SUF ¶ 245; Ex. 116 to First Brody Decl.

Investment Packet at 36.  *See Lucent Techs*, 363 F. Supp. 2d at 717 (steps taken to cover up or conceal a "misdeed . . . support[] a finding of conscious or reckless behavior").  David also knew that the First Opinion Letter had long since been rescinded and that the author of the Second Opinion Letter had drafted both the Superseding and July 2018 Letters expressing doubt regarding the legality of the loan aspect of Premier's Plan when he and Premier continued to use the June 2018 Informational.  David even called the July 2018 Letter a "hatchet job," further demonstrating that he knew about the letter and that it was unhelpful to Premier.  SEC SUF ¶ 261 (quoting Ex. 119 to First Brody Decl.).  Moreover, David knew that the only favorable opinion letter Premier had been able to obtain did not address the loan aspect, because as he told the Premier/Provision board in November 2019, the law firm "did not want anything to do with giving an opinion about the loan program."  *See* Ex. 186 to First Brody Decl.  David's statements (described in the discussion of their materiality above) evincing his knowledge that the legal opinions were important to investors further establish that David either he knew his statements in the Investment Materials were misleading or was reckless as to the obvious danger that they would be.  Given that the SEC has established David's knowledge that the First and Second Opinion Letters had been rescinded, that the July 2018 Letter was unhelpful to Premier, that Premier was never able to obtain a favorable opinion regarding its loan program, that the legal opinion letters were important to investors, and that David discouraged prospective investors from contacting the authors of the letters, a reasonable jury could find only that that the material misrepresentations Defendants made in the Investment Materials presented a danger of misleading prospective investors of which David either knew or should have been aware.  And, for the reasons outlined in Section III.A.1, *supra*, the Court once more imputes David's scienter to Premier.

The Court therefore holds that the SEC has established liability as to the misrepresentations regarding Premier's legal opinions, in addition to those regarding David's involvement in Premier's management and his criminal history, Premier's banking relationships, and Premier's patents.

## IV.    CONCLUSION

For the foregoing reasons, the Court will **GRANT** the SEC's Motion for summary judgment against Defendants Premier and David and find Defendants Premier and David liable for the First and Second Claims for Relief in the Complaint.  An appropriate order follows.

Dated:  June 24, 2025

Evelyn Padin, U.S.D.J.